S0000 4853

RECEIVED
U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

DEC 09 2025

BY:_____ DANIEL J. McCOY, CLERK

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF LOUISIANA SHREVEPORT DIVISION

HUNTER BOULWARE, Plaintiff, v. WALMART INC. and WAL-MART LOUISIANA, LLC, Defendants.

CASE NO.: [_____]

## Summary of the Complaint: Boulware v. Walmart Inc.

1. I, Hunter Boulware, pro se, file this Complaint against Defendants Walmart Inc. and Wal-Mart Louisiana, LLC (collectively, "Walmart" or "Defendants"). I allege as follows upon personal knowledge and belief, save for those matters alleged upon information and belief:

2. To avoid confusion and to protect privacy, I use pseudonyms for certain non-party individuals and customers. All customer and other non-party names in this Complaint are pseudonyms unless explicitly identified as actual names. The names Ashish Modi, Justin Jackson, Jennifer Dupree, Angel James, "Bower," and "Sean" are actual names of Walmart personnel referenced in this Complaint. "Sean" is the manager to whom I provided my handwritten arbitration objection on January 24, 2025.

### I. Jurisdiction and Venue

3. Jurisdiction: This civil action arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(4). The Court has supplemental jurisdiction over my related state-law claims for defamation per se and intentional infliction of emotional distress pursuant to 28 U.S.C. § 1367(a).

4. Venue: Venue is proper in the Western District of Louisiana, Shreveport Division, pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b). The unlawful employment practices and defamatory publications occurred in Shreveport, Louisiana, where I was employed at Walmart Store #278.

### II. Parties

5. Plaintiff: I am an adult citizen and resident of Louisiana and was employed as a pharmacy technician at Walmart Store #278.

6. Defendants: Walmart Inc. and Wal-Mart Louisiana, LLC (collectively "Walmart") are employers within the meaning of Title VII and conduct business in this District.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

7. Service: Walmart Inc. and Wal-Mart Louisiana, LLC may be served with process through their registered agent, C T Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

---

## III. PRELIMINARY STATEMENT: THE INSTITUTIONAL PURGE OF TITLE VII WITNESSES

8. This action describes a pathological failure of corporate governance wherein a major employer, Walmart, has transformed the mundane into the malicious to purge a protected Title VII litigant. The factual nucleus of this action is stark: having already engaged in protected activity against a former employer, I was subjected to a flagrant violation of federal law by my direct supervisor, Ashish Modi. The conflict centered on Justin Jackson, my former supervisor from the very Title VII case I was litigating, who had previously entered my Walmart workplace armed and hostile. Mr. Modi, having already expressed his disdain for my EEOC participation by conditioning my employment on "letting the Walgreens thing go", was also physically frightened of Mr. Jackson because he knew Jackson had brandished a weapon in the store.

9. The breaking point occurred when Mr. Jackson—acting entirely unprovoked—utilized a cashier, Angel James, to convey a vulgar message telling me to "fuck off". I did not solicit this interaction, nor did I speak to Mr. Jackson; rather, this unprovoked verbal assault was a calculated continuation of the same discriminatory hostility Mr. Jackson had directed at me during our prior employment. It was the resurrection of the exact Title VII conflict I was supposed to be protected from. Yet, when I reported this third-party harassment to Loss Prevention, Mr. Modi did not protect me. Instead, motivated by a combination of retaliatory animus against my protected activity and his own fear that my reporting would provoke Mr. Jackson to do something unlawful, Mr. Modi issued a draconian ultimatum. Modi did not threaten to fire me because of the vulgarity itself—which I had merely received from Justin Jackson, as I said nothing to Justin Jackson—Modi threatened to fire me for reporting Justin Jackson. Modi explicitly stated that if I ever reported Justin Jackson again, I would be terminated. Modi sought to purge me from the company not because I was a problem, but because I was the magnet for a problem Modi was too afraid to manage.

10. To enforce this regime of silence, exactly ten days after I reported this threat to upper management, the Defendants deployed a calculated digital trap. On January 24, 2025, the electronic time clock wouldn't even allow me access (the electronic software); it physically barred me from clocking in unless I first pressed "Agree" to a Mandatory Arbitration Agreement (MAA). This created a coercive Catch-22: Walmart policy strictly requires that any discussion with management regarding employment terms must occur on the clock, yet the system refused to let me on the clock until I surrendered my rights. I was thus forced to click "Agree" solely to gain the standing necessary to immediately hand-deliver my written objection to

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

management. This "sign-or-starve" tactic constitutes compensable work off-the-clock and renders the agreement void for duress. I emphasize that the discussion of wage theft primarily centers around the invalidity of the MAA; while the unpaid time is likely a trivial financial matter to Walmart, it is legally vital because it proves the agreement was procured through illicit coercion rather than voluntary consent.

11. A Caricature of Management (The Pencil Analogy): But whatever pretense of legitimacy the Defendants attempt to claim evaporates upon reviewing the pretext for termination. Walmart weaponized a statistically inevitable and trivial consumer interaction—a Facebook friend request sent months earlier—into a career-ending charge of "gross misconduct". The absurdity here is palpable. The alleged "victim," an adult woman, never complained. Rather, a non-witness aunt lodged a grievance regarding an allegation that I was "staring" at her niece's breasts between May 2025 and July 2025. This was a classic game of telephone: the aunt reconstructed her niece's feelings regarding the alleged staring and reported them to the Store Manager, who investigated and correctly dismissed the complaint as meritless. To terminate a high-performing employee for this is the jurisprudential equivalent of firing a worker for dropping a pencil—treating the inevitable, minor friction of human interaction as a capital offense. The contrast exposes the "Code of Conduct" as a sham: I was purged for the equivalent of dropping a pencil, yet Ashish Modi—who committed a flagrant Title VII violation by explicitly threatening to fire a witness—remains employed and protected. The Code is not a shield for ethics; it is a sword for retaliation.

12. It was Market Health and Wellness Director Jennifer Dupree who revived this dead, hearsay complaint. Ms. Dupree is not a neutral actor; she is the very individual to whom I had formally reported Mr. Modi's illegal threat to fire me. Yet, as confirmed by the Defendant's own internal documents submitted to the Louisiana Workforce Commission (LWC), it was Ms. Dupree who personally escalated this matter to execute the purge . This is a textbook example of "Cat's Paw" liability as defined by the Supreme Court in Staub v. Proctor Hospital, 562 U.S. 411 (2011). Ms. Dupree acted as the biased supervisor (the "monkey") by overruling the neutral Store Manager and forcing a sham investigation through Ethics. Investigator Jesse Hensley (the "cat") acted as her instrument, ignoring exculpatory digital evidence to reach the predetermined conclusion necessary to purge a Title VII liability [refer to Exhibit A, proving that even Walmart's narrative communicated to the LWC corroborates this sequence of events.]

13. The Systemic Purge (Judicial Notice of Pattern): I am not an isolated casualty of a unique misunderstanding; rather, I am the latest statistic in a documented pattern of retaliation. Defendant Walmart has repeatedly utilized a specific "playbook" to purge whistleblowers: (1) seize upon the occurrence of a protected complaint as a trigger to target the employee; (2) manufacture a pretextual "policy violation" or "integrity issue"; and (3) execute a termination that was decided before the investigation even began. This pattern was laid bare in the very recent filing of Elisa Bandi v. Walmart Inc. (N.D. Tex. Oct. 2025), where a pharmacy employee was terminated hours after a protected complaint. The evidence revealed a chilling administrative reality: her final paycheck and termination packet had been printed and placed on the desk before she even entered the room. This physical evidence

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

proved that the investigation was a piece of theater performed to sanitize a decision that had already been made.

14. Weaponizing "Gross Misconduct" (The Fonseca & Monsanto Precedents): The Defendants' strategy relies on the destruction of the witness's reputation. In Fonseca v. Walmart Inc. (Super. Ct. Cal. Nov. 2024), a jury awarded the plaintiff $34.7 million, finding that Walmart had systematically defamed a former employee by branding him with "gross misconduct" solely to punish him for exercising his rights. Similarly, in my case, the Defendants have escalated from "obstruction" to "sexual harassment" and finally to a fabricated felony-level allegation of "stalking" a Team Lead on the very day I served legal notice . In a move that transcends all bounds of decency under White v. Monsanto Co., 585 So.2d 1205 (La. 1991), Defendants fabricated this stalking charge without ever interviewing me or verifying my location via GPS. These labels are functional; they are designed to ensure that I am too stigmatized to ever effectively testify or find comparable employment again.

15. Defamation Per Se and the LWC (Williams Precedent): This campaign of character assassination did not stop at internal records. In a definitive act of defamation per se, the Defendants published these malicious falsehoods to the Louisiana Workforce Commission (LWC). Specifically, they falsely asserted that I had committed "Sexual Harassment" and "Stalking," and—most damningly—lied that I had provided a "verbal admission" to these crimes. This conduct squarely mirrors the liability established in Williams v. MMO Behavioral Health Systems, L.L.C. (5th Cir. 2020), where the Fifth Circuit affirmed liability for an employer who knowingly submitted false grounds for termination to the LWC. By branding me a predator in official state records to attempt to deny me unemployment benefits, the Defendants have engaged in the same reckless abuse of privilege condemned in Williams, designed not just to fire me, but to render me unemployable .

16. Strategic Self-Defeat (The EFAA Trigger): Ironically, in their zeal to destroy my reputation, the Defendants have legally defeated themselves. By formally branding me as a "sexual harasser" in their termination rationale to the Louisiana Workforce Commission, the Defendants have triggered the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (EFAA), 9 U.S.C. §§ 401–402 . Under federal law, the mere allegation of sexual harassment invalidates the arbitration agreement and compels this case to remain in federal court. The Defendants cannot have it both ways; they cannot brand me a predator to justify the firing and then invoke arbitration to hide the retaliation.

17. The Necessity of Deterrence: Consequently, the enforcement of the law in this case is not merely about restoring the livelihood of Hunter Boulware. It is about preserving the structural integrity of Title VII for every future participant. The "Anti-Retaliation" provision of the Civil Rights Act functions as the fire alarm for the American workplace. It relies entirely on the willingness of individuals—"witnesses"—to pull the lever when they see the smoke of discrimination. By purging me, the Defendant has sent a clear, economic signal to every other employee in the store: If you report misconduct, you will be destroyed.

18. If the Defendants are permitted to brand me a predator to justify this firing and then hide behind arbitration or summary judgment, they will have successfully priced

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

retaliation as a cost of doing business. I ask this Court to look past the corporate veil and see this for what it is: a retaliatory destruction of a man's livelihood and reputation for the "crime" of asserting his civil rights. The message sent by this judgment must be unequivocal: breaking the law to purge a complainant must be more expensive than doing business legitimately.

## V. Causes of Action

COUNT I — Title VII Retaliation (Participation and Opposition; Burlington Northern Standard; Cat's Paw)

19. I incorporate the preceding paragraphs as if fully set forth herein.

20. Violation of the Participation Clause (The "Blacklisting" Violation): a. Legal Standard: Under 42 U.S.C. § 2000e-3(a), it is unlawful for an employer to discriminate against an applicant or employee because he has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." The Supreme Court in Robinson v. Shell Oil Co., 519 U.S. 337 (1997), held that this protection extends to former employees and applicants to prevent "blacklisting" that would deter victims from reporting discrimination. b. The Violation: Defendants violated this clause ab initio by conditioning my employment on abandoning my protected federal lawsuit against Walgreens. Pharmacy Manager Ashish Modi's repeated directives to "let the Walgreens thing go" constituted a direct attack on my status as a Title VII litigant. By treating my prior protected activity as a defect to be cured rather than a right to be respected, Defendants engaged in unlawful pre-employment and ongoing retaliation.

21. Violation of the Opposition Clause (The "Justin Jackson" Violation): a. Legal Standard: The Opposition Clause protects employees who oppose any practice made an unlawful employment practice by Title VII. The Supreme Court in Crawford v. Metropolitan Government of Nashville, 555 U.S. 271 (2009), clarified that "opposition" extends to answering questions during an internal investigation. Furthermore, reporting third-party harassment is protected conduct. b. The Violation: When I reported that Justin Jackson—a known harasser from my prior litigation—had entered the workplace armed and threatened me, Mr. Modi did not investigate. Instead, he issued a direct threat: "If you ever report Justin Jackson again, I will terminate you." This threat to fire me for reporting harassment is a per se violation of the Opposition Clause.

22. Materially Adverse Action (The Burlington Northern Violation): a. Legal Standard: In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), the Supreme Court held that an adverse action is any conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." b. The Violation: Defendants engaged in a campaign of adverse actions designed to dissuade me: i. Threats: Mr. Modi's explicit threat of termination. ii. Coercion: Forcing me to sign the MAA under

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

threat of exclusion (see Count IV). iii. Suspension: Placing me on unpaid suspension. iv. Fabrication: Creating a false "stalking" record on the day of my legal notice. v. Termination: Firing me on August 19, 2025. Each of these actions, individually and collectively, meets the Burlington Northern standard for actionable retaliation.

23. "Cat's Paw" Liability (The Staub Violation): a. Legal Standard: Under Staub v. Proctor Hospital, 562 U.S. 411 (2011), an employer is liable if a biased supervisor performs an act motivated by discriminatory animus that is intended to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action. b. The Violation: Market Director Jennifer Dupree possessed retaliatory animus because I reported her subordinate (Modi) for illegal threats. She acted as the biased supervisor ("monkey") by overruling the neutral Store Manager—who found the "staring" complaint meritless—and forcing the investigation to Ethics. Investigator Jesse Hensley ("cat") acted as her instrument, ignoring exculpatory evidence to achieve the termination she desired. Defendants are strictly liable for Dupree's manipulation of the investigatory process.

24. Requested Relief for Count I (Title VII Retaliation): I invoke 42 U.S.C. § 2000e-3(a) and the remedial framework of 42 U.S.C. § 2000e-5(g), including reinstatement, front pay or back pay, restoration of benefits, and injunctive relief. To the extent compensatory and punitive damages are available under 42 U.S.C. § 1981a, I request an award up to the applicable statutory cap for an employer of Walmart's size (currently $300,000 for employers with more than 500 employees), exclusive of back pay and front pay. I also seek reasonable attorney fees and costs where authorized.

COUNT II — Defamation Per Se (Publication to LWC; Williams)

25. I incorporate the preceding paragraphs as if fully set forth herein.

26. Legal Standard: Under Louisiana law, defamation requires: (1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) fault (negligence or greater); and (4) resulting injury. Statements accusing a person of a crime or conduct that tends to injure their professional reputation are defamatory per se.

27. Violation via Publication to the LWC (Williams Violation): a. Case Law: In Williams v. MMO Behavioral Health Systems, L.L.C., No. 19-30757 (5th Cir. 2020), the Fifth Circuit affirmed that an employer abuses its qualified privilege in LWC submissions if it makes statements with knowledge of their falsity or reckless disregard for the truth. b. The Violation: Defendants published the following falsehoods to the LWC (Exhibit A): i. That I committed "Harassment Sexual – Substantiated." ii. That I committed "Stalking" by circling a Team Lead's apartment. iii. That I made a "verbal admission" to these acts. c. Proof of Malice: Defendants acted with actual malice because: i. They possessed the Facebook algorithm screenshot proving the "improper access" claim was impossible. ii. They

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

possessed audio recordings proving I denied the allegations (refuting the "verbal admission"). iii. They "substantiated" the stalking allegation on the same day it was made (August 14) without asking me a single question or checking my location, demonstrating reckless disregard for the truth.

28. Defendants' fabrication and transmission of false "stalking" and "sexual harassment" accusations to the LWC is central to this defamation per se claim and demonstrates reckless disregard for the truth.

29. Injury: As a direct result, my reputation in the pharmacy community has been destroyed, rendering me unemployable in my chosen profession.

30. Williams Benchmark for Damages: In Williams v. MMO Behavioral Health Systems, LLC, No. 19-30757 (5th Cir. July 9, 2020), the Fifth Circuit affirmed a defamation verdict arising from an employer's false accusation of timecard fraud to the Louisiana Workforce Commission, with $112,000 in general damages and $112,000 for past loss of income, for a total of $224,000 affirmed on appeal. That framework supports my request for comparable general and special damages here, subject to the facts proven at trial.

31. Unidentified Co-Worker / Conditional Defendant (Phantom Anonymous Complaint): To the extent Defendants contend that a specific co-worker accused me of stalking or similar misconduct, I presently lack the identifying information necessary to name that person. If discovery or compulsory process reveals the identity of this alleged individual, I seek leave to amend to add her as a defendant for defamation and related torts. I would seek a modest separate judgment against that individual in the amount of $500 to deter reckless or attention-seeking falsehoods that weaponize workplace politics and destroy careers.

COUNT III — Intentional Infliction of Emotional Distress (White v. Monsanto)

32. I incorporate the preceding paragraphs as if fully set forth herein.

33. Legal Standard: In White v. Monsanto Co., 585 So.2d 1205 (La. 1991), the Louisiana Supreme Court defined liability for IIED where conduct is "extreme and outrageous," causing severe emotional distress. Conduct is outrageous when it goes "beyond all possible bounds of decency."

34. The Violation: Defendants did not merely fire me; they weaponized the corporate machinery to frame me for a felony ("stalking") on the very day I asserted my civil rights. a. Fabricating a stalking charge against a whistleblower to silence them is conduct that transcends all bounds of decency. b. Defendants knew that labeling me a "stalker" and "sexual harasser" in my permanent file would act as a "Scarlet Letter," subjecting me to perpetual fear of background checks and effectively ending my career.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

35. Causation: This calculated malice caused me severe emotional distress, anxiety, and humiliation, precisely as Defendants intended.

36. Requested Relief for Count III (IIED): Based on the extreme and outrageous course of conduct described in this pleading and the principles articulated in White v. Monsanto Co., 585 So.2d 1205 (La. 1991), I seek general damages for severe emotional distress, humiliation, and mental anguish in an amount to be determined by the trier of fact, together with all costs and any attorney-fee shifting authorized by applicable law.

COUNT IV — FLSA Unpaid Work Time (MAA Review Off the Clock)

37. I incorporate the preceding paragraphs as if fully set forth herein.

38. Legal Standard: The FLSA requires compensation for all hours worked. "Work" includes mental exertion controlled by the employer and pursued for the employer's benefit (Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590). Activities that are "integral and indispensable" to principal activities are compensable (Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. 27).

39. The Violation: On January 24, 2025, Defendants violated 29 U.S.C. §§ 206 and 207 by intercepting me at the time clock and forcing me to review and sign the Mandatory Arbitration Agreement (MAA) "off the clock" as a condition of starting my shift. a. Theft of Time: The mental effort to review a legal contract waiving statutory rights is compensable work. By mandating this be done prior to clocking in, Defendants committed wage theft. b. Coercion: This act also serves as evidence of the coercive environment, supporting the claim that the MAA is void for duress.

40. Requested Relief for Count IV (FLSA): Under 29 U.S.C. § 216(b), I seek recovery of all unpaid minimum wages and/or overtime compensation for compensable time worked, together with an additional equal amount as liquidated damages. To the extent Defendants attempt to invoke the good-faith mitigation provision of 29 U.S.C. § 260, I submit that the targeted, retaliatory use of the MAA to coerce uncompensated work defeats any claim of good faith. I also seek reasonable attorney fees and costs as mandated by the statute.

COUNT V — Declaratory Judgment: Nullity of MAA Due to Duress (La. Civ. Code art. 1959)

41. I incorporate the preceding paragraphs as if fully set forth herein.

42. Legal Standard: Under La. Civ. Code Art. 1959, consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation.

43. The Violation: The Mandatory Arbitration Agreement ("MAA") is null and void because my signature was extorted through economic duress. Defendants presented the MAA on

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

January 24, 2025, with the ultimatum that I could not work (and thus could not eat or pay rent) unless I signed immediately. a. Lack of Consent: I provided a contemporaneous written objection (Exhibit M) stating: "I do not currently consent to arbitration, waving judicial relief. Prior to clocking in this morning, I was required to 'agree' to be coerced into arbitration, especially considering that my coworkers are not compelled under arbitration..." b. Public Policy: Enforcing a contract obtained through such predatory "sign-or-starve" tactics, applied selectively only to the whistleblower, violates Louisiana public policy and the principles of free contract. The MAA is also void because I contemporaneously stated in writing that I did not consent to arbitration or to waiving judicial review.

44. Anticipated Arbitration Defense—Handwritten Objection and Alleged Ratification: Defendants may argue that I could not object to the MAA by providing a contemporaneous handwritten notice while also signing the document and continuing to work. That argument fails because my written objection was delivered on January 24, 2025, at the very moment the MAA was imposed, and it memorializes my immediate, express non-consent to arbitration and to waiving judicial review. Walmart required me to be on the clock to speak with management about work-related contractual matters; my continued work that day was therefore necessary to communicate and preserve my objection, not a voluntary ratification of a coerced agreement.

45. Anticipated Arbitration Defense—Delegation Clause: To the extent Defendants contend that the MAA contains a delegation clause requiring an arbitrator to decide enforceability, I specifically challenge any such delegation provision as itself procured through the same duress, retaliatory coercion, and lack of free consent described above, and I request that this Court decide the threshold validity of the MAA before any compelled arbitration.

46. Anticipated Arbitration Defense—At-Will Employment and Economic Coercion: Defendants may argue that a threat of termination in an at-will setting cannot constitute duress. Here, however, the MAA was imposed as a targeted, retaliatory condition designed to strip only me—the protected Title VII witness and whistleblower—of judicial remedies in the immediate wake of my protected activity. This selective, punitive use of a "sign-or-starve" ultimatum plausibly constitutes "unjust and considerable injury" under La. Civ. Code art. 1959 and violates the Louisiana policy requiring free and voluntary consent to waive statutory rights.

47. Requested Relief for Count V (Nullity of MAA): Pursuant to Louisiana Civil Code art. 1959 and the broader Louisiana policy requiring free and voluntary consent, I seek a declaratory judgment that the Mandatory Arbitration Agreement is null and void as a product of economic coercion, and an order preserving my full access to judicial remedies for all claims asserted herein.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

COUNT VI — Louisiana Wage Payment Act / Penalty Wages (La. R.S. 23:631–632)

48. I incorporate the preceding paragraphs as if fully set forth herein.

49. Legal Standard: The Louisiana Wage Payment Act ("LWPA"), La. R.S. 23:631–632, requires an employer, upon discharge, to pay the amount then due under the terms of employment on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first. Under La. R.S. 23:632, an employer's failure or refusal to comply with La. R.S. 23:631 exposes the employer to penalty wages of up to ninety days' wages at the employee's daily rate, or full wages from the time of demand until payment, whichever is less, together with reasonable attorney fees in a well-founded suit. La. R.S. 23:634 further prohibits any contract or practice that requires an employee to forfeit wages already earned upon discharge.

50. The Violation: By failing to pay me for the compensable time spent reviewing the MAA on January 24, 2025, and potentially for time spent during the unpaid suspension which was a pretext for retaliation, Defendants have failed to pay the full "amount then due" upon my termination. I am therefore entitled to penalty wages and attorney fees.

51. Statutory Authority and Penalty Structure: La. R.S. 23:631 requires payment of the amount then due under the terms of employment on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first. If an employer fails to comply, La. R.S. 23:632(A) provides penalty wages equal to the lesser of (1) ninety days' wages at the employee's daily rate of pay or (2) full wages from the time of my demand for payment until the employer pays or tenders the unpaid wages.

52. Good-Faith Exception and Interest: Under La. R.S. 23:632(B), if the court finds an employer's dispute over the amount of wages due was in good faith, but nonetheless finds wages owed, liability is limited to the wages in dispute plus judicial interest incurred from the date suit is filed. If the failure or refusal to pay was not in good faith, the full penalty-wage framework of Subsection A applies.

53. Attorney Fees Trigger: La. R.S. 23:632(C) further authorizes reasonable attorney fees in a well-founded unpaid-wages suit filed after three days have elapsed from the time of making the first demand following discharge or resignation. I therefore seek unpaid wages, penalty wages up to the statutory maximum, judicial interest as applicable, and attorney fees and costs.

54. Federal Preemption Under the EFAA (The 'Whole Case' Standard): Finally, and dispositive of the entire jurisdictional question, the Mandatory Arbitration Agreement is wholly unenforceable as a matter of federal law with respect to this entire lawsuit. On March 3, 2022, Congress enacted the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), codified at 9 U.S.C. §§ 401–402. This statute explicitly

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

invalidates any pre-dispute arbitration agreement with respect to a "case" that relates to a sexual harassment dispute.

1.  55. Application to This Case: (1) The Statutory Trigger (The Allegation Controls): Defendants explicitly justified my termination in their official submission to the Louisiana Workforce Commission by labeling my conduct as "Harassment Sexual – Substantiated" [Exhibit A]. Under 9 U.S.C. § 401(4), a "sexual harassment dispute" is defined as a dispute relating to conduct that is alleged to constitute sexual harassment. By formally alleging that I committed sexual harassment to justify my firing, Defendants triggered the EFAA. The fact that I vehemently deny the allegation does not remove the case from the EFAA's protection; on the contrary, the dispute is the factual disagreement over whether that allegation is true or defamatory. To hold otherwise would lead to the absurdity that only plaintiffs who admit to harassment are protected by the EFAA. See Yost v. Everyrealm, Inc., 657 F. Supp. 3d 563 (S.D.N.Y. 2023) (applying EFAA where plaintiff disputed the characterization of conduct). Defendants cannot plausibly reframe this dispute as a routine employer-employee disagreement divorced from sexual harassment when their own official state-agency submission brands my termination as "Harassment Sexual – Substantiated." Exhibit A is not a collateral detail; it is the employer's chosen legal characterization of the event that purportedly justified my discharge. The EFAA turns on what is alleged, and Defendants themselves injected a sexual-harassment allegation into the basis for termination and into the LWC record. Because that allegation is the fulcrum of the stated rationale for my firing and is central to my retaliation and defamation claims, this case necessarily "relates to" a sexual harassment dispute within the plain meaning of 9 U.S.C. § 402(a), and the Mandatory Arbitration Agreement is unenforceable as to this entire action.

2.  56. (2) The Scope (The 'Whole Case' Doctrine): The EFAA invalidates arbitration agreements for the entire "case," not merely the individual claim of harassment. The statute uses the word "case," distinct from "claim" or "cause of action." See Johnson v. Everyrealm, Inc., 657 F. Supp. 3d 535 (S.D.N.Y. 2023) (holding that where a plaintiff plausibly alleges a sexual harassment dispute, the EFAA renders the arbitration clause unenforceable as to the entire lawsuit, including related claims for retaliation and wages).

3.  57. (3) Inextricable Intertwining: My claims for Defamation (Count II), Retaliation (Count I), IIED (Count III), and Wage Penalties (Count VI) are inextricably intertwined with the sexual harassment allegation. The Defamation claim exists because they published the "Sexual Harassment" label; the Retaliation claim exists because they used the "Sexual Harassment" investigation as a pretext; the IIED claim exists because of the distress caused by the "Sexual Harassment" accusation. Because the "Sexual Harassment Dispute" is the nucleus

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

of every count in this Complaint, the EFAA prohibits Defendants from slicing this case apart. The entire matter must remain in this Article III Court.

58. Supplemental Memorandum to Ensure Completeness

59. MEMORANDUM OF LAW AND STATEMENT OF FACTS (Non-Exhaustive; Supporting the Complaint)

V. Background and Chronological Context (July 2024–August 2025)

60. I am a long-tenured pharmacy technician. Before joining Walmart Store #278 in Shreveport, Louisiana, I worked for Walgreens for approximately sixteen years. My separation from Walgreens is the subject of a separate federal Title VII lawsuit that centers on Justin Jackson, a Walgreens supervisor who orchestrated a false "gross misconduct" termination after I used twelve vulgar words in a meeting I never should have been placed into, while management tolerated far more extreme conduct from female coworkers, including punching me and throwing food at me. That earlier case, and my related EEOC activity, placed a false "gross misconduct" label on my record that I have been forced to litigate to remove.

61. Before I was ever hired by Walmart, Pharmacy Manager Ashish Modi made my employment conditional on "letting the Walgreens thing go." In a pre-hire phone conversation, Modi explicitly told me that if I could not put the Walgreens matter behind me, he would not hire me. At that point, he already knew that I had engaged in EEOC-protected activity concerning Walgreens and Justin Jackson. Conditioning a job offer on effectively abandoning civil-rights claims is itself unlawful under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), which protects both opposition and participation in the enforcement process.

62. Once I started at Walmart, that theme of hostility toward my protected activity continued. When Justin Jackson entered Walmart armed and hostile on July 13, 2024, I promptly reported the incident to Modi. Modi was clearly displeased that Jackson had come into the store and that I had raised the issue, but he did not yet threaten termination. When Jackson returned a second time, on December 22, 2024, and I again reported him through proper channels, Modi told me, in substance, that if I ever reported Jackson again, he would fire me for "gross misconduct." In other words, the threat of termination was explicitly tied to my willingness to engage in protected activity about the same former manager who had already cost me one career.

63. Before I was hired, I openly disclosed to Pharmacy Manager Ashish Modi that my separation from Walgreens had been falsely labeled as "gross misconduct" and that I was

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

actively challenging that label through EEOC activity and federal litigation. After I began working at Walmart, whenever a trivial matter occurred, Mr. Modi repeatedly invoked "gross misconduct" in a joking manner to the team. Because everyone knew I was the employee who had been branded with that label at Walgreens, these comments operated as a running stigma and an implicit threat. Most importantly, on December 22, 2024—after Justin Jackson used a cashier, Angel, to tell me to "fuck off" and I reported that retaliatory harassment—Mr. Modi was not joking when he stated that if I ever reported Justin Jackson again, I would be terminated for "gross misconduct."

64. Exactly ten days after I escalated my concerns in writing to Market Health and Wellness Director Jennifer Dupree on January 14, 2025, Walmart presented me with a Mandatory Arbitration Agreement ("MAA") that had not been part of my original onboarding. I was instructed to review and sign this legal waiver off the clock, on my own time. Requiring an hourly employee to perform legal work related to employment without pay violates the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., and Louisiana wage-and-hour law, and it also undercuts any claim that the MAA reflects voluntary, informed consent. A contract extracted by conditioning continued employment on unpaid legal labor is not freely agreed to; it is the product of economic coercion.

65. These facts matter because they explain Walmart's mindset when the later complaint about my interaction with a customer—"Jane Doe"—arose. I had worked at Walmart for roughly two years without a single written reprimand. Then, once corporate and Ethics were formally on notice of my protected activity and my August 13–14, 2025 anti-retaliation letters, a cascade of "substantiated" labels suddenly appeared in a matter of weeks: "Harassment Sexual – Substantiated – Termination," "C-MBI – Substantiated – Termination," an "ID-Obstruction" code, and a brand-new "Team Lead stalking" claim first marked "substantiated" on the very day I formally invoked Title VII's anti-retaliation protections. None of these labels is supported by the evidence; all of them appeared only after I was identified as a litigation risk by "Ethics" (by Walmart Corporate: HR).

VI. The C-MBI Allegation and Investigator Hensley's Theory

66. The central "C-MBI" accusation is that I misused Walmart's pharmacy system, Connexus, to obtain Jane Doe's last name from a starting point of only her first name to then find her last name, so that I could then locate her on Facebook and send a friend request. That theory came principally from investigator Jesse Hensley.

67. In our first interview, Hensley asked about my general interactions with customers, my use of Facebook, and whether I had sent Jane Doe a friend request. I explained, candidly, that Facebook's "People You May Know" feature routinely suggests profiles to me—overwhelmingly women—and that I have long had the habit of adding those suggested profiles more or less mechanically, much like a person swiping on a dating app. I showed

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

Hensley my "People You May Know" feed during the call; he acknowledged that it was populated almost entirely by women and that I add people at random from that list.

68. Throughout the interview, Hensley repeatedly pressed a single hypothesis: that even if Facebook ultimately showed Jane Doe to me, I must have first used Walmart's system to learn her last name. He walked through a hypothetical in which I meet a customer who introduces herself only as "Jane," then I (hypothetically) go into Connexus, search for "Jane," scroll until I find a matching profile, learn that her last name is Doe, and then use that full name to search for and add her on Facebook. In that scenario, he suggested, my use of the system would be "for personal reasons" and therefore "mishandling of business information."

69. Assuming Jesse's hypothesis is even possible, which it is not; I denied, repeatedly and unequivocally, that I had ever used Connexus that way for any customer, including Jane Doe. I explained that I had never searched a profile in Connexus for the purpose of acquiring a customer's last name so that I could pursue her on social media. I also pointed out the internal incoherence of his hypothesis: if I am "looking up" a name in Connexus for a given person, that means I already know enough identifying information—name plus other data—to locate that specific record. If I truly had only "Jane" and no other context, then typing in "Jane" will not yield a list of possibilities, as Jesse hypothesized. His hypothesis is technically impossible, as Walmart's system does not provide results from only a first name. More information is necessary to even conduct a search. Jesse's hypothesis is fundamentally flawed (from the start) because the software "Connexus" does not allow this search. In order to conduct a profile search, personnel must already have a last name. And if I already have a given person's first and last name, then searching on "Connexus" to find someone on Facebook is an utterly unnecessary step. Why not just cut that step out? Jesse's hypothesis is fundamentally flawed because Walmart's system does not allow this search at all.

70. In a later follow-up call, Hensley identified two specific dates—January 27, 2025 and July 13, 2025—on which Connexus logs showed that I accessed Jane Doe's profile. He asked why I had done so. I answered as honestly as I could: I did not recall the specific purpose, but on any such date the likely reasons are mundane ones—filling or verifying prescriptions, preparing for an immunization, or using the profile to greet and assist the patient efficiently at the counter. I described how I routinely look up familiar customers when I see them in line so that I can have their prescriptions ready, and how I do this for many people: long-time patients like "John Richards," friends of Modi such as "Ms. Rogers" and her daughter, and others with whom I have had prior interactions. I emphasized that the goal is always to provide faster and more courteous service, not to harvest names for personal use.

71. When Hensley asked directly whether I had ever accessed Jane Doe's profile on either of those dates "for personal reasons" or for the purpose of adding her on Facebook, I answered

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

"no." When he asked a further, clarifying question—whether I had ever searched any customer's name in Connexus for strictly personal reasons unrelated to business needs—I again answered "no."

## VII. The Facebook Screenshot And Why "When" Is Irrelevant

72. The recorded interviews establish two important points. First, Hensley's entire theory is that I must have used Walmart's system to obtain Jane Doe's last name from a starting point of only her first name. Second, I consistently denied using Connexus (as this is not even possible) in that way and instead explained that Facebook itself suggested "Jane Doe" to me, as Facebook suggested has thousands of other women over time.

73. The Facebook screenshot I preserved makes Hensley's hypothesis untenable on its face. The screenshot shows Jane Doe's full profile being served to me in the "People You May Know" feed, together with an advertisement for the 2024 World Chess Championship. That combination of content anchors the suggestion to a specific time window and confirms that Facebook's internal algorithm—not Connexus—is what placed Jane Doe's full name and photo in front of me. The screenshot itself (the suggestion of Jane Doe) conclusively proves that Facebook independently concluded that our profiles were connected in some way (such as mutual friends or some other metric determined by the platform, Facebook) and Facebook's internal algorithm suggested her to me accordingly.

74. The audio recordings reflect that I do not remember precisely when I knew her entire name. However, I know that she has provided her entire name (first and last name to me) over the months that I have seen her at the pharmacy. The key point, however, is that the exact time of "when" I acquired Jane Doe's name does not matter, at all. Even if I had first learned her full name at the pharmacy, the Facebook screenshot itself proves that I did not need Connexus to discover it for social-media purposes. Facebook's "People You May Know" engine did that work on its own.

75. The interview recordings (from 18/July/2025) show that Hensley himself framed the potential violation as occurring only if I used the system for the purpose of obtaining a last name so that I could look a customer up on Facebook. The recordings also show that I consistently denied doing this, explained my actual workflow, and emphasized that I never use Connexus for purely personal reasons. [Exhibit E]

76. Hensley's theory thus fails for three independent reasons:

77. Technical and practical impossibility. Connexus is not designed to let a technician find a person's profile with only a first name. Entering "Jane" will not produce a list of "Janes" with various last names. "No data" will be displayed if someone has only a given person's first name only. More information is necessary to produce an output. A first name (only) is insufficient input to produce an "output." This clearly demonstrates that Jesse Hensley is not

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

knowledgeable about Connexus. And it fundamentally means that Jesse's hypothesis that I used Connexus to find her last name is impossible. Therefore, Jesse's hypothesis is flawed without even discussing this further.

78. Momentarily ignore the technical impossibility discussed above. The chronological impossibility: On the recorded call from 8/Aug/2025, Jesse Hensley discusses two dates that he obviously believe are significant otherwise why were those dates discussed? It is likely (given Jesse Hensley's stated hypothesis from 18/July/2025 and the recorded call on 8/Aug/2025) that the two dates (13/July/2025 & 27/January/2025) are potentially "smoking gun moments" (as Jesse views it), while however in reality there is nothing but "smoke" from Jesse's busted hypothesis. [Exhibit F]

79. The screenshot that I provided to Jesse Hensley directly after the phone proves not just the impossibility of Jesse Hensley's hypothesis because the screenshot is of her name being suggested to me, making any "searching on Connexus" to "find someone" redundant. Why would I need Walmart's system to add someone if Facebook provided that information to me directly??

80. What's more than this, the screenshot (for Facebook's suggestion of Jane Doe) captures an advertisement of the Gukesh vs Diren Liren World chess tournament, stating "one week to go." Meaning that the two dates that Hensley was questioning me about (13/July/2025 & 27/January/2025) were certainly not when I first knew of her name.

81. The reason that this statement can be made is because the World Chess Championship was held in mid-November of 2024. Mid-November of 2024 predates 13/July/2025 & 27/January/2025. This chronological evidence is not even necessary to disprove Jesse's hypothesis, though; (as again) the suggestion of Jane Doe conclusively proves that Facebook suggested Jane Doe to me. Making Walmart's system completely unnecessary for Jesse Hensley's hypothesis, period.

82. And CERTAINLY not that I need this evidence, but I have helped Jane Doe (face-to-face) on multiple occasions. And within those face-to-face interactions she provided her first and last name to me directly. Again, NOT that this fact matters at all in this case. I mention this here because Jesse seemed to be so hung up on when I first knew her first name or how I obtained her first name within the interview from 18/July/2025. Jane Doe has told me face-to-face, on multiple occasions! However, I cannot be sure of exactly when I first knew of her entire name, but this knowledge is completely unnecessary information to this case, but I have chosen to include it because Jesse seemed to be adamant about knowing this on the recording from 18/July/2025. I think that I present this information herein to preemptively mention this point to directly prevent another fallacious hypothesis from him in the future.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

83. What matters is Walmart's system had absolutely no bearing on the Facebook request that I am discussing. The 3rd reason provided above (alone) puts the nail in the coffin for Jesse Hensley's hypothesis. And this conclusively refutes that I "misused business" information.

84. The claim that I "misused" business information is technically impossible because Walmart's own system requires a minimum input to produce an output; it is chronologically impossible because the 2 dates discussed that were of concern to Jesse (13/July/2025 & 27/January/2025) come (in time) after mid-November (approximately one week prior to the beginning of the 2024 World Chess Championship), as the timestamp (advertisement) from when Jane Doe was suggested to me proves this truth.

85. And finally, Jesse Hensley's hypothesis is completely laid to rest with the same evidence (the screenshot) itself. As the suggestion of Jane Doe to me (alone) is proof of this. Why would I use Walmart's system to "find" Jane Doe's name so that I can then add her on Facebook??? Why not just cut out the Walmart system access and go directly to the adding??? Jesse Hensley's hypothesis is laid to rest, with several nails in the coffin.

86. The discussion above is an utter annihilation to Jesse Hensley's hypothesis.

87. And yet I am terminated after I provided all this information to him??

88. To further isolate the Facebook / "C-MBI" portion of Walmart's story, I emphasize again that the following is a hypothetical and does not describe what actually occurred in my case. Assume, solely for the sake of argument, that over the course of ordinary pharmacy interactions I met a customer—call him John Public—learned his name in the normal way that happens at any pharmacy counter over a period of months, and later sent him a Facebook friend request from my personal account. In that scenario, I would not have "mined" Walmart's systems at all; I would simply be using a name learned through routine, face-to-face conversations while doing my job. John Public would remain entirely free to ignore, decline, or block the request. Treating that easily declined social-media request as "gross misconduct," "sexual harassment," or "misuse of confidential business information" is not a principled application of any policy; it is an extreme rebranding of everyday, revocable social contact into a career-ending offense. That conclusion is even more unreasonable given that I worked for Walmart for roughly two years without a single written reprimand of any kind; to suddenly declare that this hypothetical, commonplace Facebook interaction is "gross misconduct" sufficient to end a previously unblemished employment record is beyond disproportionate. This is not what actually happened in my case, but even if Walmart's own best-case Facebook hypothetical were true, Walmart would still lose on those facts.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

89. In reality, the record shows that Walmart's "Connexus lookup" / C-MBI theory is false. The Facebook "People You May Know" screenshot proves, first, that Facebook's algorithm independently suggested Jane Doe to me, and not the other way around. The screenshot captures her suggested profile together with an advertisement for the 2024 World Chess Championship stating that the event was "one week to go," which anchors the suggestion to mid-November 2024—months before the Connexus access dates that Hensley later tried to treat as "smoking guns." I did not take screenshots of all, or even most, suggested profiles. The reason I preserved this one is because I recognized Jane Doe as a pharmacy customer and felt uncomfortable about the optics of Facebook inserting a patient from work into my suggestion feed. In other words, the screenshot not only disproves the idea that I needed Walmart's system to "find" her; it also reflects my own unease about how the situation might appear, which is precisely why I documented it.

90. Over the years, most of the individuals who I have added from Facebook's "People You May Know Algorithm" are not screenshotted. The mere presence of the screenshot also proves that I was not sure that I should add her, even though the platform suggested her. As I recall, I believe that I may have even asked coworkers if I should add her, given she was suggested by Facebook, and I recognized her from work.

91. I feel it important to reiterate this point: I have added thousands of individuals to my Facebook (the vast majority I have never met & have never even spoken to) the presence of the screenshot of her also proves (itself) that I felt uncomfortable just adding her because I did recognize her from work.

92. In spite of this, in modern society, individuals routinely look up and connect with coworkers, classmates, and acquaintances on social media. This is not per se wrongful conduct, nor is it inherently harassing. The law does not draw a bright line between people who never send a social-media request and those who do; it draws a line between ordinary, good-faith attempts to connect with someone one has met in a legitimate setting and a campaign of unwanted, escalating contact after a clear request to stop. Even if, arguendo, the facts had been different—and I had manually searched for a customer we can call "John Public" after seeing him repeatedly at the pharmacy, speaking with him, and learning his name in the normal course of professional interactions—a later attempt to send a Facebook friend request would still be a socially ubiquitous act, not stalking or sexual predation. It would not, without more, transform a lawful, everyday interaction into "gross misconduct."

93. A social-media "friendship" in this context is not a deep or intimate relationship; it is a loose, pseudo-friendship created and managed by an algorithm, which either party can unilaterally end at any time simply by ignoring, declining, or blocking a request. Adults navigate these online spaces every day without courts or employers treating each request as inherently dangerous. To retroactively criminalize such a routine, low-stakes interaction—especially where the customer has full control over whether any online

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

connection exists—would collapse the distinction between benign, lawful conduct and true harassment, and it would chill normal social behavior by employees who simply wish to remain courteous and approachable to customers. Even on the worst-case hypothetical version of the facts most favorable to Walmart, the conduct at issue would not reasonably rise to the level of gross misconduct that justifies professional exile and permanent reputational stigma.

94. The Respondent's theory, if accepted, would create an impossible standard for every pharmacist and pharmacy technician: the mere act of recognizing a name and later encountering it on a social media platform would be enough to justify termination. That is not, and has never been, the law. The problem in this case is not that I supposedly learned a customer's name and could have looked it up; the problem is that Walmart took an ordinary, ubiquitous practice in the age of social media and weaponized it as a pretext to purge a Title VII witness from its workforce.

95. 4.4 The "Planet Fitness" Analogy: The Necessity of Social Lubricant in a Mechanical System

96. The Respondent's accusation that my accessing of patient profiles lacked a "verified business purpose" reveals a fundamental misunderstanding of human social dynamics and the specific "reciprocal altruism" required in a high-stress service environment. To explain this to the Court, I must employ an analogy I provided to the LWC & Walmart HR, one that illustrates the difference between "policy" in a vacuum and "behavior" in a functioning society.

97. Consider the social contract of a gymnasium, specifically Planet Fitness. When I enter the gym, my goal—my teleological purpose—is to expend energy. I am there to lift heavy objects against gravity to induce muscle hypertrophy. It is an environment designed for struggle. Because of that, the additional physical effort of opening a heavy glass door for another person is not, in itself, any kind of burden; I am literally there to expend effort. The real cost is time. Every few seconds I spend standing in the doorway holding the door, and every moment the other person spends hurrying or even running to reach the door because I am holding it, is time that could instead be invested in actual training sets that produce hypertrophy. In that sense, the 'price' of the courtesy is not muscular exertion but the loss of finite training time for both people.

98. From a strictly robotic, "policy-driven" perspective, this action is inefficient. It forces me to expend energy that is not directed toward my workout. It reduces the physical effort required by the person behind me, technically contradicting their goal of "working out". Yet, we perform this ritual of "holding the door" universally. Why? Because it is a "social

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

lubricant." It reduces the friction of human interaction. It signals cooperation. It prevents the door from slamming in a stranger's face, which would disrupt the social equilibrium of the environment.

99. In the pharmacy, checking the "work queue" for a recognized customer is the digital equivalent of holding the door. It is a low-cost investment of time that yields a high-value dividend in customer satisfaction and operational smoothness. It is an anticipatory act. If I see a regular customer—John Publick, Caleb Morton, or the customer in question, Jane Doe—physically present in the store, I access the queue not to "stalk" them, but to ensure the "door" doesn't slam in their face when they reach the counter. I am checking to see if their prescription is stuck in "data entry," if it has a "Third Party Reject" (TPR), or if it is simply lost in the digital ether.

100. To punish this behavior is to punish the very instinct that makes a service economy function. It is akin to the "New Boss" on the construction site firing the "Witness" for warning a coworker about a loose scaffold, simply because the warning wasn't in the foreman's handbook.

101. Once a profile was pulled up for legitimate pharmacy reasons, it was also common practice among technicians and pharmacists at Store #278 to talk briefly about the individual whose profile happened to be on the screen. If a customer had been rude that day, or had a history of being rude or difficult in prior encounters, staff routinely commented on that fact while the profile was already open. The same was true when a customer was well-liked or memorable for benign reasons. The initial access always flowed from a legitimate business purpose—processing a prescription, resolving a third-party reject, updating demographic or insurance information—but once the profile was pulled up, employees frequently discussed the customer in the ordinary course of their workday. I was not unique in this respect; this was the ordinary culture of the pharmacy and a routine, tolerated practice for everyone.

102. Accordingly, even if, contrary to my position, one were to assume arguendo that on some occasion I pulled up Jane Doe's profile (or that of another pseudonymous customer such as "Amanda") without a contemporaneous business task attached to that click, the decision to single me out for the ultimate penalty of termination while ignoring the identical, everyday conduct of my coworkers is itself powerful evidence of disparate treatment and retaliatory motive. The only material difference between me and the other technicians who engaged in the same routine behavior is that I was the employee who had already filed and was actively pursuing a Title VII charge and federal lawsuit against Walgreens, and who had repeatedly reported retaliation and policy violations within Walmart. Under these circumstances, Walmart's attempt to re-label a ubiquitous workplace habit as "gross misconduct" only when I engage in it reinforces, rather than undermines, the

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

conclusion that the "improper access" narrative is a pretext to punish me for my protected activity.

103. I have articulated specific, verifiable narratives—elements of which were shared with Investigator Hensley, and detailed fully to HR and the LWC—that act as "control groups," proving that this behavior was my standard operating procedure for all familiar customers, not a targeted obsession with one female customer.

104. Narrative 1: The "John Publick" Pricing Audit (Inventory Integrity) I detailed an interaction with a customer, John Publick. He requested OTC *******. The Respondent's point-of-sale system contains a known, maladaptive "glitch": it permits a quantity of "13" to be sold, while the physical package dispensed contains "30" tablets (a full box).

105. After the transaction, I accessed Mr. Publick's profile. I did not do this to glean personal information. I did this to perform a forensic audit of the transaction. I needed to verify that the "quantity dispensed" matched the "quantity billed." If I failed to do this, and Mr. Publick returned the following month to find the price had increased (because I corrected the error later), he would accuse me of cheating him . By accessing the profile post-transaction, I was protecting the Respondent's inventory integrity and shielding the pharmacy from a future customer service failure. This access was an act of diligence, yet under the Respondent's current, twisted logic, it is "gross misconduct" .

106. Narrative 2: The Proactive Care Protocol (Lauren Pierce and Caleb Morton) I have established a reputation for proactive care with several specific customers who rely on my diligence.

107. Lauren Pierce: Jane Doe "loves me" as a technician precisely because she values my proactive care. She relies on me to ensure her prescriptions are processed before she reaches the counter, saving her time and frustration.

108. Caleb Morton: Similarly, when I see Mr. Morton, I check the profile to ensure his needs are met before a service failure occurs.

109. These are not acts of "mishandling information." They are acts of high-level professional competency. To fire a technician for checking the status of Lauren Pierce or Caleb Morton is to punish efficiency. It reveals that the investigation into Jane Doe was not about policy enforcement; it was about finding a pretext to remove the "Witness."

110. Narrative 3: The "Confetti/Jeremy" Protocol (Defensive Behavior) I provided a third scenario that is critical to understanding the workplace ecology. When the work queue is empty, the screen displays a "confetti" image on the filling technician's handheld, signaling that all tasks are complete. In these moments, technicians—myself and a coworker, Jeremy—might engage in conversation about AI or other topics .

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

111. However, the system is imperfect. A patient, "John Public," might be sitting in the waiting area in acute pain (e.g., from a root canal), waiting for a narcotic like Norco. If his prescription was set to "future fill" due to a data entry error (e.g., the date wasn't updated from Monday to Tuesday), the system will hide it. The filling pharmacy technicians' scanners (to the scanners to fill prescriptions) will show "the confetti image," implying no work is needed to be accomplished (to fill) on their filling scanners, while however, "John Public's" prescription is actually held up by insurance within the work queue, never reaching the "filling station."

112. From John Public's perspective, he sees two technicians laughing while John sits in agony. This generates a valid, damaging complaint: "They were laughing while I was in pain".

113. To prevent this—to defend the reputation of the pharmacy—I developed a protocol. If I see a customer waiting, even if the screen shows confetti, I must check their profile to ensure their order isn't trapped in the digital limbo of "future status". This access is a defensive measure. It is an act of survival. By accessing the profile, I am not "snooping"; I am ensuring that the optical reality of the pharmacy matches the digital reality.

114. The Respondent ignored these explanations. They ignored the "John Publick" audit. They ignored the proactive care provided to Lauren Pierce. They ignored the "Confetti" defense. They stripped these actions of their context to manufacture a crime.

115. 4.5 The "Obstruction" Lie: A Linguistic Sleight-of-Hand

116. Having failed to prove that my access was malicious (because the Facebook algorithm proved I didn't need the system to find her name), the Respondent pivoted to a procedural trap: "Obstruction."

117. They claim I "obstructed" the investigation by "stating I did not look into the patient's profile". This is a lie. It is a demonstrably false statement, refuted by the molecular evidence of the case: the verbatim transcript of my interview on July 18, 2025.

118. Deconstructing the Transcript: In the interview, Investigator Hensley asked me a direct question. My answer was equally direct.

119. Hensley: "Have you ever specifically looked up Jane Doe, though, in your system in the pharmacy."

120. Boulware: "I've just explained to you, yes. Like, if I see someone in line, I do that with a lot of my customers...".

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

121. There is no ambiguity here. "Yes" means "Yes." I admitted the act. I admitted the behavior. What I denied—and what I continue to deny—is the improper motive that Hensley was attempting to impute to me. I denied that I looked her up for "personal use."

122. Hensley: "Have you ever searched anyone's name, any customer's name in the system for your own personal use or personal reasons that aren't business related?"

123. Boulware: "No, I haven't." .

124. The Respondent has engaged in a deliberate linguistic distortion. They have conflated a denial of intent (mens rea) with a denial of action (actus reus). They have taken my statement "I did not look her up for personal reasons" and twisted it into "I did not look her up at all," solely to charge me with lying to an investigator. This is the tactic of a prosecutor with no case, fabricating a procedural crime to secure a conviction.

125. Independent Verification: The AI Analysis: To subject this claim to the most rigorous, unbiased scrutiny possible, I submitted the raw transcript to the Gemini 2.5 artificial intelligence model for textual analysis. I asked the AI a simple binary question: Did Hunter obstruct the investigation by stating that he did not look into the customer's profile?

126. The AI's conclusion was definitive and damning for the Respondent: "Conclusion: The claim that Hunter obstructed the investigation by 'stating he did not look into the profile' is false... The transcript shows that Hunter did not deny looking up the profile; on the contrary, he explicitly admitted to the action of looking up the profile multiple times."

127. When an artificial intelligence, stripping away all emotion and bias, analyzing purely the semantic structure of the language, concludes that the Respondent's central justification for termination is "false," the presumption of pretext becomes overwhelming. Walmart fired me for a lie that they invented.

128. 4.6 The Rejection of Resolution: The Ignored Offer of Voluntary Withdrawal

129. Perhaps the most damning evidence that this investigation was a search for a pretext rather than a search for a solution lies in the Respondent's refusal to accept my explicit, good-faith offer to de-escalate the situation. On August 8, 2025, immediately following my suspension interview with Investigator Hensley, I sent him a written communication containing not only exculpatory evidence but a proactive proposal to resolve any potential friction with the customer, Jane Doe.

130. I explicitly volunteered to remove myself from the equation entirely. I wrote to the investigator: "I do not plan to ever help [Jane Doe] in the future (if possible)... I plan to politely remove myself from wherever she is (if possible), allowing someone else to help

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

her... to 'go to the bathroom,' or more generally allow others to help her... This is a good idea, to prevent any potential misunderstandings in the future".

131. Consider the humility of this offer. I was willing to physically hide—to retreat to the restroom—solely to ensure the comfort of a customer and to preserve my employment. A rational employer, concerned with maintaining a harmonious workplace, would have accepted this pragmatic solution: separate the parties, eliminate the interaction, and close the file. By ignoring this offer to "avoid HR issues" through voluntary withdrawal, and instead proceeding to terminate a high-performing employee based on refuted allegations, the Respondent demonstrated that its objective was not the resolution of a conflict, but the extermination of a liability. They did not want peace; they wanted a purge.

132. 4.7 The Vacuum of Notice: The Impossibility of a "Pattern" Without Warning

133. A fundamental tenet of both employment law and basic fairness is the concept of notice. For behavior to be classified as "harassment"—and certainly for it to rise to the level of "gross misconduct" warranting immediate termination—there must typically be a pattern of conduct that persists after the employee has been warned that such conduct is unwelcome.

134. In this case, the Respondent has constructed a narrative that Jane Doe felt uncomfortable "over a period of months." Yet, prior to the investigation initiated on July 18, 2025, management never once informed me of any complaint, concern, or discomfort regarding this customer.

135. The "Silent Foreman" Analogy: Consider a construction site where a worker is tasked with stacking bricks. He stacks them in a specific pattern for six months. The Foreman watches him daily, says nothing, and issues no corrections. Then, one day, the Foreman fires the worker for "gross misconduct," claiming that the stacking pattern was dangerous and that he had been "doing it wrong for months." In this scenario, the failure lies not with the worker, who was never informed of the error, but with the Foreman, who allowed the condition to persist. By remaining silent, the Foreman tacitly approved the behavior. To fire the worker retroactively is not management; it is entrapment.

136. Application to the Facts:

137. The First and Only Notice: The first time I was ever informed that Jane Doe (or her aunt) had an issue with my demeanor was during the investigation that led to my termination.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

138. The Failure of Management: If Jane Doe or her aunt had complained previously, as the "months of discomfort" narrative implies, then Walmart management failed in its fundamental duty to inform me. Had I been told, "Hunter, this customer feels you are staring," I would have immediately corrected the behavior—perhaps by looking at the wall, or avoiding her entirely. By withholding this information, management denied me the opportunity to correct a misunderstanding and instead allowed the "account" to build up until they could cash it in for a termination.

139. The Absence of a Pattern: Harassment requires intent and repetition in the face of objection. My interactions with Jane Doe were benign professional courtesies (e.g., the Regina Spektor comment). Without a prior warning that these interactions were unwelcome, they cannot constitute a "pattern of harassment." They are, at worst, awkward misunderstandings.

140. In my July 18, 2025 interview with Investigator Jesse Hensley, I explained that my comment that a customer resembled singer Regina Spektor was a brief, non-sexual observation about her distinctive appearance. The interview reflects that the interaction was cordial and that the customer later engaged in ordinary conversation with me about the artist and her music. This context undermines any attempt to elevate that isolated, benign remark into a "gross misconduct" justification for termination.

141. Conclusion: If this was the first complaint, a warning was the appropriate remedy. If there were prior complaints, management's failure to warn me absolves me of "willful" misconduct. By terminating me for a first-time, un-warned, and subjective allegation, the Respondent proves that it was not seeking to correct behavior, but to seize a pretext to remove a liability. I was fired for a "crime" I was never told I was committing.

142. 4.8 The Architect of Escalation: Jennifer Dupree's Intentional Avoidance and Active Harm

143. While the machinery of retaliation involves many cogs, the conduct of Market Health and Wellness Director (MHWD) Jennifer Dupree on and around August 14, 2025, represents a specific, catalytic failure of leadership that transformed a manageable dispute into a legal conflagration.

144. The Attempt to De-Escalate: On August 14, 2025, recognizing the gravity of the false accusations accumulating against me, I actively sought to avoid litigation. I reached out to Ms. Dupree directly and repeatedly. My intent was not adversarial; it was remedial. I sought her intervention to correct a manifest error before it became irreversible. I provided her with the same exculpatory evidence I had sent to Investigator Hensley—the "Facebook Algorithm" proof—and I formally served her with the Litigation Hold notice.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

145. I approached her with the hope that she would act as a corrective force against the bias of the local management. I extended an olive branch, seeking a conversation to de-escalate the tension and return to the status quo of a productive workplace.

146. The Active Choice to Harm: Ms. Dupree did not merely fail to return a call; she engaged in a strategy of intentional avoidance at all costs. She declined to answer my calls. She refused to acknowledge my messages. But her silence was not passive; it was a prelude to aggression.

147. It is a statistically improbable coincidence that on the very same day (August 14) that I reached out to her for help—providing evidence of my innocence and asking for a dialogue—a new, "nuclear" allegation of stalking suddenly materialized in my files. The timeline suggests a direct causal link: my plea for help was met not with a return call, but with a retaliatory strike. It is highly probable that Ms. Dupree, rather than investigating my claims of innocence, initiated or ratified this new, fabricated complaint to justify my immediate removal.

148. Conclusion: Instead of helping an employee who was being targeted, Ms. Dupree actively harmed him. She took the information I provided—intended to exonerate me—and seemingly used the contact as a trigger to escalate the purge. This is not merely "bad management"; it is a betrayal of the fiduciary duty a director owes to the integrity of their organization. By avoiding me "at all costs" and allowing (or directing) the fabrication of a criminal allegation to fill the silence, she ensured that this matter could only be resolved in a court of law.

149. Separately, the timing of the actual friend request fits with Hensley's own calculation. In the July 18, 2025 interview, Hensley told me that the friend request had been sent twenty-one weeks earlier, which he correctly inferred as placing the request in approximately February 2025. That seems right, and I do not dispute that timeline. The point is what happened after that. For roughly five months, Jane Doe continued to come to the pharmacy; there were no contemporaneous complaints from her. The eventual complaint did not originate with Jane Doe at all—it came from her aunt, speaking on her behalf, after the fact. By the time it reached Hensley, the story had already passed through several layers: my actual, Facebook request (from about Feb of 2025); whatever Jane Doe thought or felt about it; her aunt's interpretation of those feelings; and then management's retelling to Ethics (Ethics complaint first made on 11/July/2025, per Exhibit A). This is error on top of error, a classic "telephone game" in which each retelling drifts further from what actually happened and acquires more inflammatory language than anyone at the beginning of the chain ever used.

150. To reiterate: the Facebook / C-MBI hypothesis Walmart ultimately adopted did not actually happen in the way Walmart has described it, and the objective digital evidence

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

(including the November 2024 suggestion screenshot and the twenty-one-week timing Hensley himself identified) proves that hypothesis false. The John Public hypothetical simply shows that even if Walmart's best-possible version of the Facebook story were accepted—which it should not be—that conduct still would not amount to gross misconduct, sexual harassment, or misuse of confidential medical information, and still could not justify destroying a two-year, reprimand-free employment record.

151. Once these three points are understood together, the "C-MBI – substantiated" label cannot be defended as an honest mistake. At best, it reflects an investigator who clung to an initial theory even after the evidence disproved it. At worst, it reflects a decision to ignore exculpatory digital evidence because Walmart had already decided that I was a problem to be removed.

152. Furthermore, in employment law, "cat's paw" liability exists precisely because powerful institutions cannot shrug and say, "Someone else pulled the strings." Staub v. Proctor Hospital makes clear that an employer is liable when a biased actor, lacking formal decision authority, manipulates the nominal decision-maker into firing someone for discriminatory or retaliatory reasons. The doctrine presupposes avoidability: a minimally careful system, with basic skepticism and fact-checking, could have broken the chain. The harm is not an act of God; it is the product of an institutional decision to be credulous when every tool to verify is close at hand.

153. The most vivid modern analogue is "swatting" in the online gaming community. A malicious caller manufactures an emergency—hostages, gunfire, a barricaded shooter—and feeds that story into 911. In the well-known Wichita case, an online dispute led a gamer to recruit a habitual hoaxer, who phoned in a false hostage scenario to a random Kansas address. Police, primed by that narrative, arrived with rifles drawn and fatally shot an unarmed, uninvolved man on his own porch. The caller never touched a gun or rang a doorbell. His lie, once poured into a credulous system designed for genuine emergencies, became lethal force. The system's own structure magnified the lie into irreversible harm.

154. My case is the employment-law analogue, and Walmart's Ethics machinery is the corporate SWAT team. According to Walmart's own submission to the Louisiana Workforce Commission, a customer alleged that I complimented her on her outfit and stared at her breasts on multiple occasions "since May 2025," believed I had used Walmart systems to find her name so I could locate her on social media, and said that this made her uncomfortable. Yet in the same narrative, Walmart admits that it was not Jane Doe herself who first brought anything to management, but her aunt, who "reported the harassment to the Store Manager." The Store Manager, in turn, stated that he was never told that I was staring at anyone's breasts and that he did not believe what was reported to him was enough for sexual harassment. In other words, whatever Jane Doe may later have told an investigator about how she felt, the live complaint that started the chain was an

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

after-the-fact interpretation by an aunt who never even picked up prescriptions with her. [refer to Exhibit A].

155. That nuance matters. The aunt could only have formed her view in one of two ways: either by reconstructing her niece's body language from afar based on stories she heard later, or by taking some version of what Jane Doe said and re-telling it in more loaded language. Even if I assume arguendo that Jane Doe sincerely told her aunt that she felt stared at since May, the aunt is still a non-witness intermediary, and Walmart's own paperwork confirms that she—not Jane Doe—was the one who marched that interpretation into management. The pipeline runs like this: my actual conduct at the counter; Jane Doe's subjective feelings about it; the aunt's reconstruction of those feelings; the Store Manager's summary of the aunt's version; and finally the Market Health and Wellness Director's decision to push it into Ethics, where it hardened into "Harassment Sexual – Substantiated – Termination" and "C-MBI – Substantiated – Termination" in a state-agency file. That is not a straight line of perception; it is a classic telephone game.

156. In a rational system, the escalation would have stopped at the store level. The Store Manager did exactly what a sensible front-line supervisor should do: he listened to the aunt, concluded that what had been described to him was "not enough for sexual harassment," and did not treat it as such. Cat's paw avoidability sat in plain view. A minimally careful organization would have left the matter at that level or, at most, asked me a basic clarifying question at the pharmacy: "Hunter, a relative says this customer felt uncomfortable—can you walk me through what happened?" Instead, the complaint was revived and elevated by the one person with a pre-existing retaliatory motive against me, Market Health and Wellness Director Jennifer Dupree, who already knew that I was the plaintiff in a federal Title VII lawsuit and had been the recipient of my protected complaint, pertaining to her subordinate: Ashish Modi [I reported Mr. Modi for explicitly stating that he would terminate me if I ever reported Justin Jackson again]. When she overruled the Store Manager and forced the issue into Ethics, she did exactly what Staub warns against: she used the formal decision machinery as a conduit for her own agenda.

157. The absurdity of starting with Ethics is easiest to see if we change the subject matter. Imagine that, one afternoon, a customer thinks I have shorted her a dollar in change. The ordinary path is obvious: the customer mentions it at the counter; a supervisor counts the drawer, talks to me, and either corrects the mistake or explains the discrepancy. What Jennifer did in my case is the equivalent of bypassing all of that and treating the hypothetical one-dollar error as suspected embezzlement—calling the corporate Ethics hotline, launching a formal investigation, and writing a narrative for a state agency as if I had been caught systematically skimming the till. Is it logically possible that a wrong-change incident could someday be part of a theft pattern? Of course. But no rational employer starts with "ethics violation" when the first report arrives. You start with a simple conversation and basic verification. Elevating a second-hand complaint about how an aunt thinks her

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

niece felt, without ever speaking to me, to the level of an Ethics case is the human-resources equivalent of calling the SWAT team because a customer thinks they might be missing a dollar. The fact that Jane Doe is an adult—roughly twenty years old, not a minor—only underscores how far this is from the kind of emergency that would justify skipping ordinary steps.

158. How Walmart Misused an Inevitable Customer Complaint to Purge Me as a Title VII Witness

159. "Customer complaints are an inevitable feature of retail work, especially in a high-volume pharmacy. Over the course of thousands of customer interactions, some percentage of people will feel slighted, misheard, rushed, or simply uncomfortable for reasons that may or may not be grounded in anything I actually did. That is not unique to me; it is the predictable statistical reality of any front-line role. Even if I assume, arguendo, that Jane Doe's aunt sincerely believed the concern she carried to management—and I have no particular reason to doubt that she subjectively did—the sincerity of her complaint does not convert it into proof of sexual harassment, nor does it justify skipping every ordinary step of fact-finding. The real question is not whether a complaint will eventually arise in a retail pharmacy; it is what a responsible employer does with the first complaint that appears after years of clean service."

160. I had worked in Walmart's pharmacy for roughly two years without a single written reprimand, coaching, or counseling—no Ethics case, no write-up, no documented concern of any kind about my interactions with customers or coworkers. Then, only after my August 13–14, 2025 anti-retaliation letters put Corporate and Ethics on formal notice that I was a Title VII plaintiff and that I was invoking my rights, a lone customer-family complaint was resurrected, repackaged, and pushed straight into Ethics by the one person with an obvious retaliatory motive: Market Health and Wellness Director Jennifer Dupree. A rational employer would recognize a first-time complaint—especially one relayed through an aunt who never picked up prescriptions with the customer—as something to be handled at the store level: talk to the associate, clarify the facts, document the conversation if necessary, and move on. Instead, in my case, management treated this inevitable, first-in-two-years complaint as the long-awaited pretext to purge a Title VII witness.

161. That is where the "one-dollar" analogy becomes most revealing. In the hypothetical I gave earlier, it is logically possible that a single wrong-change incident could someday be the first visible data point in an embezzlement pattern; but nobody starts there. A reasonable employer does not call the SWAT team because a customer thinks she might be missing a dollar. You start with a drawer count and a conversation. Likewise, a reasonable employer does not jump from a single, second-hand complaint about how an aunt thinks her adult niece felt, to "Harassment Sexual – Substantiated – Termination" and "C-MBI – Substantiated – Termination," without ever speaking to the employee and without

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

reconciling the allegation with a two-year, reprimand-free history. What Jennifer did instead was the functional equivalent of treating the first, inevitable complaint in a high-volume retail environment as proof of a longstanding pattern, and then weaponizing that complaint through Ethics to rid Walmart of an employee it now saw as a litigation risk. Title VII does not permit an employer to sit back, wait for the statistically inevitable customer grievance, and then use that grievance—not as something to be fairly investigated—but as the pre-selected vehicle to remove a protected witness.

162. The same misuse of scale appears on the social-media side. The Facebook friend request that later became a pillar of Walmart's story was sent months earlier, in February, long before the July 18, 2025 interview in which I first learned that anyone claimed to feel "stared at since May." Treating that old friend request as evidence of a predatory pattern in July is like someone suddenly discovering, years later, that they have a pending friend request and deciding that the mere existence of that request retroactively proves a months-long campaign of harassment. The timeline alone should have prompted serious doubt, especially once I provided a screenshot showing that Facebook itself, through its "People You May Know" feature, had suggested Jane Doe to me alongside an advertisement tied to the 2024 World Chess Championship—a combination that anchors the suggestion to a window before the alleged "since May 2025" conduct. The screenshot proves that Facebook's own algorithm put Jane Doe's full name in front of me; I did not need, and did not use, Walmart's pharmacy system to "look up" her last name for personal reasons.

163. When I spoke with investigator Jesse Hensley on July 18, 2025, he framed the C-MBI theory around a very specific hypothesis: that I must have started with only Jane Doe's first name, then used Connexus to "look up" her last name, and then used that last name to find her on Facebook. The transcript shows him repeating, as if it were established fact, that I had allegedly complimented Jane Doe's outfit "while staring at her breasts five or six times since May of 2025," and pressing me on whether any of my comments were sexual. I denied staring at her breasts, denied any sexual motive, and explained that Facebook suggested her to me and that I routinely add suggested profiles at random. Even putting aside the technical flaws in his Connexus theory, the timing makes his premise implausible: I had interacted with Jane Doe many times at the pharmacy without a single warning, and yet I first heard that she supposedly "felt stared at since May" only in that July 18 call.

164. Even if I assume arguendo that Hensley sincerely believed his own hypothesis about how I obtained Jane Doe's last name—which is charitable, given the screenshot I received and the way Connexus actually works—the cat's paw problem remains. By the time he called me, a biased regional manager had already chosen to revive a complaint that the Store Manager himself did not view as sexual harassment. Hensley then chose to ignore the simplest exculpatory facts: the friend-request timeline, the behavior of Facebook's suggestion algorithm, the technical impossibility of using Connexus the way he described, and the Store Manager's contrary assessment. In cat's paw terms, he was the officer on the

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

porch who rushes in based on a script written by someone else, and Walmart as an institution is liable for allowing its machinery to be used that way.

165. Swatting shows how dangerous this structure becomes even when the last link in the chain thinks he is behaving responsibly. The officer who shot Andrew Finch may well have believed, in that instant, that he was confronting an armed suspect; the fatal error lay in the institution's willingness to treat an unverified, emotionally charged narrative as operational truth. In the same way, Walmart chose to treat a non-witness aunt's account and a "since May" storyline as if they were hard facts, to override its own Store Manager's conclusion that the report did not rise to harassment, to disregard the digital evidence that undercut the C-MBI narrative, and to stamp "Harassment Sexual – Substantiated – Termination" and "C-MBI – Substantiated – Termination" on my record and in a state-agency file, together with a false claim that I had given a "verbal admission."

166. From my perspective, as the person caught inside this machinery, the swatting analogy and the wrong-change analogy converge on the same point. An accusation I had never been warned about—rooted at best in how a twenty-year-old customer retrospectively says she felt and relayed through an aunt who never picked up prescriptions with her—was fed into a system that treated it as gospel, stripped away qualifiers, and translated it into the authoritative language of "substantiated sexual harassment" and "C-MBI misuse" in official communications to a government agency. I was never given the equivalent of a knock on the door; I was never allowed to stand on the figurative porch and say, "What is going on? Who is saying this, and when did they first say it?" [Exhibit J]

167. Cat's paw liability is the legal recognition that this is not an unfortunate misunderstanding. It is the predictable outcome of a design that invites telephone-game distortions and then arms them with the full force of an employer's disciplinary and narrative power. Walmart had every opportunity to break the chain—by trusting its own Store Manager, by treating the aunt's report as a minor concern rather than an Ethics case, by looking hard at the Facebook timeline, by questioning the internal logic of Hensley's theory. Instead, it chose to behave like a corporate SWAT team called out over a missing dollar in change, deploying its heaviest weapons against an employee largely because he was known to assert his civil-rights protections. That is precisely the kind of avoidable, system-level failure the cat's paw doctrine is meant to reach.

VIII. Why The "C-Mbi – Substantiated" Label Is Defamatory

168. Walmart did not keep Hensley's theory inside the internal Ethics file. It carried that narrative forward into its written submission to the Louisiana Workforce Commission. On

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

the "Termination Rationale" page, Walmart represented that "C-MBI" had been "substantiated" and that I had given a "verbal admission." Both statements are false.

169. I never admitted to using Connexus to obtain Jane Doe's last name for personal reasons. The transcripts show no such admission; they show the opposite. I acknowledged that I add people from Facebook's suggestion feed and that I found Jane Doe attractive in the same way I have found many other suggested profiles attractive, but I denied using Walmart's system for that purpose and explained why the hypothesis did not make sense. Walmart's decision to tell the LWC that I had "admitted" a C-MBI violation therefore crosses the line from negligence into reckless disregard for the truth.

170. Under Louisiana law, accusing someone in a quasi-judicial setting of misusing confidential business information to pursue a customer, in combination with sexual-harassment and stalking labels, is defamation per se.

171. A. Fabricated Team Lead "Stairs" Stalking Allegation and Evidence of Malice

172. Separately and distinctly from the Facebook theory, Walmart's LWC submission attributes to an unidentified Team Lead an entirely different allegation: that I supposedly appeared at her apartment stairs and "circled" her building. According to Walmart, this Team Lead claimed that I had previously come to "her area" in the backroom to talk to her, had made comments about her clothing or hair, and then later "showed up outside of her apartment by her stairs," briefly spoke with her, walked away, and then "continued to circle her apartment a few times before disappearing." I never had any conversation with any Team Lead at any apartment stairs. I have never gone to a Team Lead's apartment complex, never "briefly spoke" with a Team Lead at her stairs and never circled any Team Lead's apartment "a few times before disappearing." People do not casually misremember a coworker appearing at their home by the stairs of their apartment building, conversing there, and then circling their building. That is the sort of vivid, high-salience event that a person either actually experienced or fabricated. If the alleged Team Lead exists and actually made this statement, then it is not an innocent, slightly inaccurate memory—it is a detailed, invented story. That is evidence of malice, not a sincere mistake.

173. I was initially inclined to focus my defamation claim primarily on Walmart as an institution, but I was wrong to treat the purported Team Lead as irrelevant. If she exists, she is individually subject to defamation law. Respondeat superior makes Walmart vicariously liable for what its employees publish in the course and scope of their employment, but it does not erase the personal liability of an individual who fabricates a story about a coworker at her apartment stairs. My evidence that this is defamation and not an honest error is straightforward: there has never been any conversation with me at any stairs, at any apartment, at any time. That kind of encounter is not the sort of thing one innocently "mislabels" or vaguely misremembers. It is either true or it is maliciously false. The fact that

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

this new "stairs and circling the apartment" narrative first appears and is marked "substantiated" on August 14, 2025—the exact day I sent detailed anti-retaliation notices and litigation-hold demands—only heightens the inference of malice. It is also impossible to reconcile with my two-year history at Walmart without a single reprimand: nothing for two years, and then, on the very day I invoke Title VII protections, a brand-new, uninvestigated "stalking at the stairs" story appears out of nowhere and is instantly believed.

174. Another red flag in Walmart's own narrative is the way the supposed "compliments" to the unidentified Team Lead suddenly appear, fully formed, only on August 14, 2025, after I had already been suspended and was away from the workplace. In the LWC rationale, Walmart claims that this Team Lead reported that I had previously come to her backroom area on multiple occasions to talk to her and had made repeated comments about her clothing and hair. Yet there is no trace of any such concern in the record at any earlier point in my two-year, reprimand-free employment: no coaching, no counseling, no write-up, no Ethics case, no email. According to Walmart, these interactions supposedly "had been happening" for some time, but they materialize for the first time, fully "substantiated," on the very same day my anti-retaliation letters and litigation-hold demands hit Ethics. The far more plausible explanation is that someone in HR or Ethics retrofitted this language into the written summary—assuming that no one would ever parse the timing closely—to make my termination look less like retaliation against a known Title VII plaintiff and more like the removal of a long-problematic associate. That is not just defamation; it is the deliberate use of invented misconduct to purge a Title VII witness and to rid Walmart of an employee it feared might sue, which is an illegal motive for termination under Title VII's anti-retaliation clause. Moreover, even as Walmart itself describes them, these supposed "compliments" are not even sexual in nature; they are generic remarks about clothing or hair that no reasonable investigator would retroactively elevate into evidence of sexual harassment or a basis for termination.

175. Another glaring inconsistency in the Team Lead "stairs" narrative is the complete absence of any police involvement. Stalking outside a person's home—at an apartment stairwell, no less—is precisely the kind of event that, if it truly occurred and caused genuine fear, would be expected to generate either a 911 call or at least a contemporaneous report to law enforcement. If I believed a coworker had shown up at my residence, spoken with me at my stairs, and then "continued to circle [my] apartment a few times before disappearing," I would contact the police, or at minimum insist that management involve law enforcement. The fact that there is no police report, no reference to police contact, and no indication that Walmart ever urged the alleged victim to seek that protection strongly undercuts the claim that anyone actually experienced what is described. I am, in fact, genuinely doubtful that this "Team Lead" even exists in the manner Walmart has described. If she does exist and actually made this statement, then in my view she is seeking attention at my expense, and I intend to pursue her individually for defamation, separate and apart from my respondeat

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

superior claims against Walmart—not to obtain a large windfall, but to send a clear message that inventing stories about coworkers has consequences, even if the damages sought are modest (on the order of $500). The more likely explanation, however, is that this narrative is a constructed device—either fabricated within HR or repeated by someone who wanted attention—rather than a sincere report of an actual, frightening event.

176. B. The Walgreens-Referencing Evaluation: An Unforced Error

177. One of the clearest "unforced errors" in the Respondent's paper trail is the decision to inject my protected activity against Walgreens into my Walmart evaluation and related commentary.

178. Within my own performance evaluation, Mr. Modi discussed not just once within the evaluation, but several times within this document that "I should let the Walgreen's thing go."

179. An employment evaluation is not a memoir; it is a performance instrument. When a supervisor chooses to memorialize an employee's prior Title VII litigation against a different employer, the record stops looking neutral and starts looking motivated. There is no credible business reason to instruct an employee to "let the Walgreens thing go," or to treat a prior civil-rights lawsuit as a workplace performance issue. The common-sense inference is that my protected activity was viewed not as a lawful exercise of rights but as an undesirable trait—a marker of "risk" that management decided to purge.

180. This detail matters because retaliation cases often turn on whether the adverse action can plausibly be tethered to legitimate performance-based concerns. Here, the evaluation itself functions like an accidental confession: it confirms that my prior protected activity was on the mind of my supervisor and considered relevant to my status at Walmart.

C. Defamation And The "Gross Misconduct—Stalking" Label

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

181. Even apart from Title VII, the Respondent's decision to brand me with "gross misconduct" and to attach a stalking-like narrative carries independent legal consequences under state law.

182. False statements that impute criminal conduct or moral turpitude are presumptively injurious. When an employer chooses that language in internal records and in communications to state agencies, the injury is not speculative. It is foreseeable that a future employer will treat such branding as a red flag and that the branded employee will be forced to litigate his own reputation in every subsequent job interview.

183. The core factual point remains simple: the "stalking" claim is inconsistent with the objective evidence I have already preserved and will be further tested by the location data described above. If the label is false, the decision to publish it is not a benign clerical act; it is actionable reputational harm.

D. The Superior Record: Corroborating Audio

184. A central method by which the Respondent's stated reasons collapse is the existence of contemporaneous audio. These recordings preserve the real-time statements and dynamics that are otherwise vulnerable to after-the-fact reconstruction.

185. The Respondent may attempt to exclude these recordings by asserting that they were obtained improperly or that they intrude upon privacy expectations. Anticipating that tactic, I preserve here the essential legal foundation for their lawful procurement and relevance.

186. A. Federal Law

187. Under 18 U.S.C. § 2511(2)(d), federal law permits the recording of a conversation when one party to the communication consents. As a participant in these conversations, my consent satisfies the federal statutory requirement.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

188. B. Louisiana Law

189. Under La. Rev. Stat. Ann. § 15:1303(C)(4), Louisiana follows a one-party consent rule. Because I was a party to these communications while located in Louisiana, my recordings are lawful under the law of the state where I was located.

C. Arkansas Law

190. The investigation and interviews were conducted by Jesse Hensley, the investigator, through Walmart's Home Office, which is located in Bentonville, Arkansas.

191. Under Ark. Code Ann. § 5-60-120, Arkansas is likewise a one-party consent jurisdiction. To the extent any portion of these communications is analyzed under the law of the Respondent's headquarters, the recordings satisfy that standard as well.

D. Practical Relevance

192. These recordings are not peripheral. They are the black-box record of a dispute in which the employer's justifications are already suspect. When an employer's defense hinges on contested verbal exchanges and alleged admissions, the higher-confidence record is the contemporaneous audio.

193. E. The Narrow Inference This Court Should Draw

194. The following inference is neither novel nor speculative.

195. The Respondent's conduct follows a classic retaliatory arc:

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

196. A known participant in Title VII activity arrives as a new hire.

197. The protected activity is noticed, discussed, and memorialized.

198. The employee engages in additional protected opposition within the new workplace.

199. Management escalates from irritation to pressure and threats.

200. The organization searches for—or manufactures—a facially neutral pretext.

201. The pretext is recorded in language severe enough not only to end the job but to end the worker's future viability.

202. Organizations rarely retaliate with an open confession. They retaliate with a story that can survive a cursory review. The "gross misconduct—stalking" narrative is that story.

203. My case is not an anomaly. The Respondent has a documented history of losing retaliation and pretext-based lawsuits, resulting in massive jury verdicts that are affirmed by federal courts. These cases serve as the "fossil record" of Walmart's liability in similar environments. They demonstrate that when the corporate survival machine malfunctions and devours its own, the legal system exacts a heavy price.

204. Case 1: McPadden v. Wal-Mart Stores East, L.P. (D.N.H. 2017)

205. The Facts: A female pharmacist was terminated and alleged retaliation for reporting safety concerns. The specific pretext used by Walmart was that she had 'lost a pharmacy key,' a minor infraction for which a male pharmacist was not fired.

206. The Verdict: A federal jury awarded $31.2 million in total damages.

207. Relevance: This case proves that juries view the retaliation against pharmacy professionals with extreme disfavor and are willing to award eight-figure sums to punish the Respondent.

208. Case 2: EEOC (Spaeth) v. Wal-Mart Stores East LP (E.D. Wis. 2021)

209. The Facts: An ADA discrimination and retaliation case.

210. The Verdict: The jury awarded $125 million in punitive damages.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

211. Relevance: Although reduced to the statutory cap, the raw number ($125 million) is a direct measurement of the jury's moral outrage at Walmart's conduct. It demonstrates that when a jury sees malice, they will attempt to inflict maximum financial pain. My evidence of the August 14th "stalking" fabrication is designed to elicit this exact level of outrage .

212. Case 3: Barham v. Wal-Mart Stores, Inc. (D. Conn. 2017)

213. The Facts: A manager alleged his termination (disguised as a "job elimination") was a pretext for discrimination and retaliation.

214. The Verdict: The jury awarded $5.5 million.

215. Relevance: This is a classic "pretext" case. The jury understood that an employer's stated reason can be a lie used to cover an illegal motive. This mirrors my case exactly, where the "investigation" was a sham to hide the retaliation for my protected activities .

216. Case 4: Fifth Circuit Precedent (My Jurisdiction)

217. Case 5: Lugo v. Walmart, Inc. (E.D. Pa. 2022) The Facts: An employee with a disability was fired for "theft" and "gross misconduct" because she used a 50-cent coupon that was technically for customers only. Walmart ignored its own progressive discipline policy to jump straight to termination. The Ruling: The federal court denied summary judgment, finding that firing a long-term employee over a 50-cent coupon was evidence of pretext for retaliation. Relevance: This demonstrates the Respondent's pattern of weaponizing trivial policy violations (like a 50-cent coupon or a Facebook friend request) to label unwanted employees as "thieves" or "grossly misconducting" to avoid standard disciplinary steps.

218. Case 6: Elisa Bandi v. Walmart Inc. (N.D. Tex. Filed Oct. 29, 2025) The Facts: In a federal lawsuit filed just weeks prior to this Complaint, another Walmart employee alleges she was fired hours after reporting harassment. Crucially, the complaint explicitly names Jesse Hensley—the same investigator in my case—as the operative who conducted the investigation. The plaintiff alleges she was "treated like a criminal," "interrogated," and that Hensley utilized coercive tactics to manufacture a pretext for termination. Relevance: The involvement of the same investigator (Hensley) in multiple retaliation lawsuits demonstrates a specific corporate modus operandi: deploying specialized "closers" to conduct sham investigations that ignore exculpatory evidence and manufacture "gross misconduct" findings against employees who report liabilities.

219. The Ruling: In T.A. v. Wal-Mart Stores (2022), the U.S. Court of Appeals for the Fifth Circuit—the federal court governing Louisiana—AFFIRMED a jury verdict and punitive damages award against Walmart for retaliation.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

220. Relevance: This defeats any internal argument by Walmart legal counsel that a Louisiana verdict would simply be overturned on appeal. The appellate courts in this jurisdiction enforce Title VII strictly against retaliatory employers .

221. 6.6 The LWC Adjudication: The Empty Vault of Evidence

222. It is crucial to note that this matter has already been subjected to a preliminary form of adjudication before the Louisiana Workforce Commission (LWC). In this administrative forum, the rules of engagement are simplified, but the burden of proof remains squarely on the employer to demonstrate "misconduct" by a preponderance of the evidence to deny benefits.

223. This proceeding served as a stress test for the Respondent's allegations. If the Respondent possessed objective proof of "gross misconduct"—video of me staring, logs of me messaging the customer, witness statements confirming the "stalking"—they would have presented it to the LWC. Corporations are rational financial actors; they do not voluntarily incur higher unemployment insurance tax rates if they can avoid it by simply producing a file.

224. The Failure: When the moment of truth arrived, the Respondent's vault was empty. Walmart was unable to present any credible evidence to support its claims of sexual harassment, obstruction, or improper access . Consequently, the LWC ruled against Walmart, and I received unemployment benefits . The Respondent attempted to ensure that I would not get unemployment benefits. This attempt failed. I did receive unemployment benefits.

225. Legal Significance: This supports a devastating inference: Walmart lacks objective evidence for its claims. The failure to produce evidence in a legal forum suggests the evidence does not exist. The "gross misconduct" label was a fiction maintained only within the closed circuit of Walmart's HR department, unable to survive in the oxygen of an external tribunal.

226. The "Individual" Letter: Further evidence of the subjective, arbitrary nature of the termination is found in the email sent to me by Walmart Global Ethics Appeals on September 4, 2025. The letter states: "Out of respect for the individual, and to protect privacy and confidentiality, we cannot release specific details about the outcome...".

227. Notice the singular noun: "individual." The Respondent justifies the destruction of my career not on the basis of "policy," "law," or "data," but out of "respect" for the subjective feelings of a single person. A termination for "gross misconduct" should be supported by hard facts. Instead, Walmart offers vague references to an "individual" (likely the biased manager Dupree or the non-witness aunt) to shield the emptiness of their case.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

228. 6.7 The "Shifting Reasons" Doctrine: The Moving Target

229. A hallmark of pretext is the "shifting reason." When an employer's justification for termination changes over time, the fact-finder is entitled to infer that the stated reasons are false and the true reason is unlawful discrimination. Gee v. Principi, 289 F.3d 342 (5th Cir. 2002).

230. The Respondent's justification has mutated repeatedly:

231. August 19, 2025 (recorded: Termination Call): I was told I was fired for "Obstruction" and "Improper Access." No mention was made of sexual harassment.

232. September 15, 2025 (Ethics Email): Suddenly, the reason expanded to include "sexual harassment"—an allegation not cited during the termination call.

233. LWC Proceedings: The Respondent then added the "stalking" allegation to the file to ensure the denial of benefits.

234. This inconsistency is not bureaucratic error; it is evidence of a scramble to find a justification that sticks. If "sexual harassment" was the true reason, it would have been the headline on August 19. Its late addition proves it was an afterthought, a garnish added to the plate to make the termination palatable to the legal department.

235. Disparate Treatment: The Control Group Analysis

236. In any rigorous investigation, the validity of a hypothesis—such as "Walmart enforces its policies neutrally"—must be tested against a control group. To determine if the Respondent uses its "Code of Conduct" as a shield for justice or a sword for retaliation, we must compare two subjects within the same ecosystem who were accused of misconduct.

237. In the laboratory of Store #278, we have a perfect control group. Subject A is a manager who committed a documented, public violation of federal law. Subject B is an hourly employee who was the subject of a hearsay complaint. The disparity in their treatment provides the definitive, mathematical proof of discriminatory intent.

238. 13.1 Subject A (The Harasser): Pharmacy Manager Ashish Modi

239. The Conduct: On December 22, 2024, Ashish Modi committed a flagrant, per se violation of Title VII and the Respondent's own internal policy. In direct response to my protected activity of reporting third-party harassment to Loss Prevention, Mr. Modi

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)                                         Page **40** of **67**

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

confronted me. He did not offer support. He did not investigate the harasser. Instead, he issued a coercive threat: "I will be terminated" if I reported the harassment again .

240. This was not a "micro-aggression" or a misunderstanding. It was a "materially adverse action" under the Burlington Northern standard. It was an explicit quid pro quo: silence for employment.

241. The Evidence:

242. Direct Testimony: I reported this threat verbally immediately to [MHWD: Jennifer Dupree], and then I reported this threat formally to Market Health and Wellness Director (MHWD) Jennifer Dupree (again) via text message on January 14, 2025.

243. Corroboration: A neutral witness, the cashier Angel, confirmed in a conversation—which I recorded using a personal recording device—that management had discussed firing me specifically for my reporting activity, stating I "almost got fired".

244. Constructive Notice: By reporting this to the MHWD, the highest level of local corporate authority was put on actual notice of Mr. Modi's illegal conduct.

245. The Outcome:

246. Investigation: None. There is no record of an investigation into Mr. Modi's threat.

247. Discipline: None. Mr. Modi was not suspended. He was not demoted.

248. Employment Status: Ashish Modi remains employed by the Respondent today.

249. 13.2 Subject B (The Victim/Whistleblower): Hunter Boulware

250. The Conduct: I was accused of "staring" at a customer based on a complaint from a non-witness aunt . I was accused of "improper access" which was technically impossible and disproven by the Facebook algorithm evidence I provided . I was accused of "obstruction" for denying an illicit motive while admitting the act .

251. Hearsay: The primary accusation relied on "double hearsay" (the aunt's account of the niece's experience).

252. Exculpatory Evidence: The Store Manager investigated the complaint and found it baseless. The Facebook algorithm proved the timeline of the "improper access" theory was impossible .

253. Record: I had zero prior reprimands in two years of employment .

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

254. Investigation: A multi-month corporate investigation led by a investigator (Hensley), involving video interviews and forensic data review .

255. Discipline: Immediate suspension followed by termination for "gross misconduct" .

256. Employment Status: Terminated and blacklisted.

257. 13.3 The Comparative Analysis

258. The disparity is absolute and scientifically undeniable.

259. The Harasser (Modi): Committed a violation of federal law (retaliatory threat). Result: Retained.

260. The Victim (Boulware): Reported the violation; accused of subjective "staring" via hearsay. Result: Terminated.

261. This creates a control group for our experiment. The only variable that explains this disparity is my protected status as a Title VII litigant and whistleblower. Mr. Modi, as a manager willing to enforce the "survival machine's" imperative of silence, was protected by the corporate immune system. I, as the "foreign agent" asserting rights, was purged.

262. This asymmetry proves that the "Code of Conduct" is a sham—a selective pressure applied only to those who threaten the hierarchy, never to those who enforce it. Under Title VII, disparate treatment is a primary method of proving discrimination. The Respondent cannot explain why a manager who threatens to fire an employee for reporting harassment is "safe," while the employee who reports it is "grossly misconducting" themselves .

263. Synthesis of the Comparative Record and Pretext

264. The transcripts of my interviews with investigator Jesse Hensley, read alongside the Facebook "People You May Know" screenshot and the Connexus access logs, show that Walmart's "C-MBI – substantiated" narrative is false. I did not use Walmart's pharmacy system to obtain Jane Doe's last name for personal purposes, as that is not even possible to do, since one cannot find a last name, given only a first name. And of course the audio files in my possession do not demonstrate that I confessed to doing so, either. Walmart nevertheless told a state agency that I had committed that violation and had given a "verbal admission," and it wrapped that accusation in additional labels of stalking and sexual harassment that were either baseless or fabricated.

265. This document, standing alone, demonstrates why those statements are defamatory and why they were part of a broader retaliatory response to my protected activity. The law

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

does not require me to accept those labels in silence. It allows me to demand that they be corrected, that the harm be compensated, and that future employers see a record that reflects facts rather than fear.

266. An independent third-party reference-check firm, Allison & Taylor, later contacted my former store manager, Mr. Ashish Modi, to obtain an evaluation of my performance and suitability for future employment. At my direction, Allison & Taylor used Mr. Modi's direct phone number, not a generic Walmart HR line, so the answers reflected what he personally chose to say when asked about me by a neutral outside evaluator. In that interview, the mask slips. Mr. Modi did not describe me as dangerous, untrustworthy, or unfit to work around coworkers or customers. Instead, he assigned me "good" ratings of four out of five in key categories such as Oral Communications, Technical Skills, Productivity, Short-Term Planning, and Long-Term Planning, and he did not mark me as "inadequate" or "poor" in any category. In reality, those "four out of five" ratings are themselves low relative to my actual performance. My objective filling metrics were consistently at the very top of the pharmacy; with rare exceptions, I was the highest-volume filler on any given day. I routinely filled more prescriptions per shift than any coworker, often by a substantial margin over the next-best performer, while maintaining accuracy and compliance. On any fair view of those metrics, my performance warranted a "five out of five," not a four. When asked whether he could enthusiastically recommend me, he answered, "Yes, I am." When asked whether I was eligible for re-hire within the organization, he answered, "Yes, I would," even though Walmart's internal records in fact reflect that I am coded as not eligible for re-hire. That statement was a "white lie" in my favor, but it is a revealing one: if Mr. Modi truly believed I had committed some serious act of misconduct that made me a danger to others, he would not have told a prospective employer that he would hire me back.

267. Allison & Taylor then asked Mr. Modi to describe my strengths and weaknesses. Mr. Modi did not tell them that I had engaged in misconduct toward a team lead, that I posed a safety risk, or that he harbored any reservations about my integrity or suitability for employment. Instead, he stated: "He is a pharmacy tech for quite sometime. He has many experience. Nothing bad to say about him. He is punctual and hardworking. He is also a tech savvy person. He work just fine. No problem." In other words, when given a clear opportunity, in a confidential reference setting, to repeat Walmart's claimed reasons for my termination, Mr. Modi chose not to say that I had done anything improper at all, much less anything approaching a crime or "gross misconduct."

268. If Mr. Modi had actually believed that I was a dangerous person, or that I had committed some serious act of gross misconduct involving a team lead, then he would have had a professional, ethical, and legal duty to warn others—especially a third-party firm tasked with determining whether I was safe to hire. He did not do that. He told Allison &

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

Taylor that he had "nothing bad to say" about me, described me as "punctual and hardworking" and "tech savvy," and said I "work just fine" with "no problem." He also told them that I was eligible for re-hire, which was untrue but favorable to me. The only reasonable inference from these answers is that Mr. Modi himself does not actually believe I am dangerous or that I ever engaged in the kind of serious, safety-related misconduct that Walmart later attached to my name. This is evidence of the mask slipping: the same supervisor who, within Walmart's internal machinery, allowed an extreme narrative to be tied to my personnel file, told an outside evaluator that I was a solid, employable worker whom he would hire again and for whom he had "nothing bad to say."

269. In sharp contrast to Mr. Modi's Allison & Taylor answers, Walmart's written communications to the Louisiana Workforce Commission tell a very different story. When HR was tasked with providing a reason for my separation, HR supplied false and defamatory reasons. In its submission to the LWC, Walmart represented that the allegation against me had been "substantiated," portrayed the situation as a serious, criminal-type offense against a coworker that supposedly justified termination for "gross misconduct," and asserted that I had admitted to the accused conduct—all of which is false. The same paperwork then attempted to hedge by suggesting that parts of the matter were "unsubstantiated." That kind of wordplay does not cure the defamation. The act of telling a state agency that it is "substantiated" that I committed a grave, criminal-type offense against a coworker is itself the defamatory publication: it is a provably false statement about a serious accusation, made to a third party, and it squarely meets the elements of defamation. Even if Walmart had never repeated that false narrative to any other third party, the false statements to the LWC, standing alone, constitute defamation per se under Louisiana law because they accuse me of conduct that, if true, would be criminal and professionally ruinous.

270. Moreover, the fact that HR was willing to give those false reasons to the LWC creates a reasonable and ongoing fear that the same or similar accusations may have been, or may in the future be, communicated to other organizations or individuals who inquire about my separation from Walmart—prospective employers, background-check firms, licensing boards, landlords, or other agencies. Just because Mr. Modi, when reached directly by Allison & Taylor, chose to speak positively about me does not mean that Walmart's HR department has not already repeated the LWC narrative elsewhere, or that it will not do so going forward. The LWC defamation is enough by itself, but it also demonstrates that Walmart HR is willing to attribute fabricated misconduct to me when speaking to third parties, and there is no proof that the damage is confined only to the LWC file.

271. It is also significant that the Allison & Taylor interview with Mr. Modi occurred only because I personally provided Allison & Taylor with Mr. Modi's direct phone number. Had Allison & Taylor simply contacted Walmart's human resources department through ordinary channels, there is every reason to believe that HR would have repeated, or closely

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

tracked, the same false narrative it gave to the Louisiana Workforce Commission—namely, that a serious violation had been "substantiated," that my conduct amounted to gross misconduct, and that I had admitted to the accused actions. HR has already shown, in its written communications to the LWC, that it is willing to attribute fabricated misconduct to me. The fact that Mr. Modi, when reached on his personal number, chose not to defame me in a reference check, and instead described me as punctual, hardworking, experienced, and free of problems, does not erase the separate defamation already committed by Walmart's HR department, nor does it rule out the possibility that HR has provided, or could provide, the same false story to other third parties if Mr. Modi is not the point of contact. In that sense, the Allison & Taylor reference highlights a narrow instance in which the truth surfaced, but it does not insulate Walmart from liability for the false and damaging statements its HR personnel communicated to the LWC and potentially to others.

272. Beyond lost wages and reputational damage, the Respondent's actions caused severe emotional distress. Being told, without warning, that one has been branded with a serious, criminal-type accusation, that this allegation has been labeled "substantiated" without a single interview, and that it will follow one forever in corporate databases and background checks is terrorizing. I will have to live under the constant fear that the false narrative could be provided to law enforcement, landlords, licensing boards, or future employers. The deliberate choice to fabricate or ratify a criminal accusation on the very day I asserted my civil-rights protections, and to preserve that accusation as a permanent marker in my personnel file, is "extreme and outrageous" conduct under White v. Monsanto and related Louisiana IIED precedent.

273. Legally, this case presents three interlocking claims. First, Walmart violated Title VII's anti-retaliation provisions by conditioning my hiring on abandoning my prior EEOC charge and federal lawsuit, by coercing a one-sided arbitration agreement targeted only at me, by suspending and disciplining me for pretextual reasons after each protected complaint, and ultimately by terminating me under a fabricated criminal-type narrative immediately after I served a formal anti-retaliation notice. Second, Walmart committed defamation per se by falsely accusing me—both internally and in communications to the LWC and third-party reference-check entities—of conduct that, if true, would constitute a crime under Louisiana law, and by labeling this fabricated misconduct as "substantiated," all with at least reckless disregard for the truth. Third, the same course of conduct—intentionally weaponizing a fabricated criminal story to destroy my livelihood and peace of mind—constitutes intentional infliction of emotional distress under Louisiana law.

274. Pharmacy Manager Ashish Modi did not threaten to fire me in isolation, and his motive was not limited to any abstract "concern" about workplace friction. From the very beginning of my relationship with Walmart—before I even onboarded—Modi made it clear that he did not want me pursuing my federal Title VII lawsuit against Walgreens at all. During hiring he learned that I had an active EEOC charge and a pending federal case, and instead of treating

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

that as a neutral background fact, he treated it as a problem. He repeatedly urged me, in substance, to "let the Walgreens thing go," and later thought it important enough to write that same theme more than once in my performance evaluation. Those written notes are not casual comments; they are documentary proof that management wanted my Walgreens lawsuit to disappear.

275. That hostility to my protected activity existed before any complaint involving "Jane Doe," and before the December 22, 2024 incident with Justin Jackson at Walmart. On July 13, 2024, Justin had already confronted me inside Walmart while openly carrying a gun, and he made clear he wanted to get me fired. Modi later learned that Justin had been armed on July 13, and he explicitly told me that this fact frightened him. By the time December 22 arrived and Justin again used a cashier as a messenger to tell me to "fuck off," Modi already knew that Justin was the same person who had once come into his store armed, and this knowledge fed into his fear of what might happen if Walmart ever barred Justin from the premises.

276. When I reported the December 22 encounter to loss prevention, I was not inventing a new grievance; I was continuing the same protected activity I had begun at Walgreens—reporting the conduct of the same individual who had already been central to my EEOC charge and federal lawsuit. Modi's response was to tell me that if I ever reported Justin again, he would fire me. On the surface, he tried to justify that threat by saying he was afraid of what Justin might do if Justin were formally banned—fear that, by his own words, came from knowing Justin had previously entered the store armed on July 13. But that fear was layered on top of a preexisting and well-documented hostility to my civil-rights activity itself. The record shows a combination of motives, with one constant through-line: Modi did not want me to be "the person who sues Walgreens," and he did not want that same person continuing to report Justin Jackson's behavior inside Walmart.

277. In substance, his message to me was not simply, "I am scared of Justin." It was, "I do not want you continuing to act like a Title VII complainant while you work here." My status as a charging party and federal plaintiff pre-dated my first day at Walmart and shaped how Modi viewed me from the outset. His written evaluation comments telling me to let the Walgreens lawsuit go, combined with his threat to fire me if I reported Justin again after learning Justin had been armed on July 13, show that he saw my ongoing litigation and my continued reporting as a single, continuous problem. Title VII does not permit an employer to condition employment on abandoning an existing federal lawsuit, nor does it allow a manager to suppress ongoing reports of harassment or retaliation because enforcing the law might upset a former supervisor who once carried a gun into the store. Modi's fear of Justin Jackson does not trump my right to pursue the Walgreens case or to report Justin's conduct through the channels Walmart itself prescribes.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

278. This is not a marginal or speculative case. The timeline, the internal documents, the external agency records, and the digital location data all point in the same direction: Walmart responded to a whistleblower and Title VII participant not with compliance, but with escalation, fabrication, and character assassination. The question before the Court is not whether something went wrong; it is how the law should remedy and deter a pattern of conduct in which a powerful employer attempts to criminalize and erase an employee for the "crime" of asserting his civil rights.

279. The Independence Of Protected Activity: Dispelling The "Merit" Fallacy

280. Before detailing the specific evidentiary roadmap, it is necessary to address a potential legal sophistry the Respondent may attempt to deploy. The Respondent may argue, explicitly or implicitly, that the legitimacy of my current retaliation claim against Walmart is somehow contingent upon the ultimate success of my underlying gender discrimination lawsuit against Walgreens.

281. This reasoning is legally defective. It relies on a fundamental misunderstanding of the architecture of Title VII.

282. 16.1 The Protection of the Process, Not the Verdict

283. The anti-retaliation provisions of Title VII are designed to protect the machinery of justice, not just the output of a verdict. The statute protects the "Participating" and "Opposing" activities themselves. Whether I win a multimillion-dollar verdict against Walgreens, or whether that case is dismissed on a procedural technicality, is entirely orthogonal to the issue of Walmart's liability .

284. Similarly, my filing of a lawsuit against Walgreen's was the act of pulling the alarm on perceived discrimination. Walmart retaliated against me for the act of pulling the lever. The ultimate finding of this court (as it pertains to the Walgreen's case) is irrelevant to the fact that Walmart punished me for accessing the mechanism. Title VII protects the right to petition, not merely the right to win. By conditioning my employment on "letting the Walgreens thing go," and by terminating me for continuing to pursue it, Walmart violated the sanctity of the alarm system itself .

285. Synthesis: The Ordered Logic Of The Law And The Collapse Of The Respondent'S Story

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

286. Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is designed to protect the employee who speaks when silence is easier and safer. The Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), confirms that retaliation is not confined to formal discipline; it includes conduct that would dissuade a reasonable worker from reporting discrimination or supporting a charge. A threat of termination for reporting an ongoing retaliatory harasser, a coercive attempt to force waiver of rights, and a final discharge under a conspicuously stigmatizing label each fall comfortably within that protected sphere.

287. The logic of this case is also chronological. Retaliation is rarely a single act; it is a sequence. When a manager repeatedly frames an employee's prior protected activity as a present-day liability, and then later memorializes that protected activity in a performance evaluation, the animus is no longer inferential. It is written. The evaluation evidence is important precisely because it is unnecessary to any legitimate performance assessment. It is the sort of admission that occurs when the actor no longer appreciates that motive can be proven by his own pen.

288. If a new employer may treat an employee's history of protected activity as a defect to be eliminated, then the practical architecture of Title VII collapses. Robinson v. Shell Oil Co., 519 U.S. 337 (1997), underscores that the statute's protection is not a narrow temporal privilege. It is a structural safeguard intended to preserve participation in the civil-rights enforcement mechanism. In other words, the law does not allow the "essential witness" to be blacklisted simply for having been a witness before.

289. The causal logic also matters. Where a biased supervisory motive is a proximate cause of the ultimate adverse action, an employer cannot launder retaliation through an "independent" process and call it neutral. Staub v. Proctor Hosp., 562 U.S. 411 (2011). The significance of this doctrine is practical: it prevents organizations from using investigative machinery as a reputational shield when the facts show that key allegations were selected, framed, or amplified by actors who already had a retaliatory agenda.

290. Pretext is shown when the employer's stated reason is demonstrably false, inconsistent with objective data, or grossly disproportionate to the alleged conduct. The Fifth Circuit recognizes that temporal proximity, shifting explanations, and provably inaccurate factual premises can each support the inference of retaliation. See, e.g., Evans v.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

City of Houston, 246 F.3d 344 (5th Cir. 2001); Gee v. Principi, 289 F.3d 342 (5th Cir. 2002). Here, the Respondent's stated theory that my conduct constituted stalking-like "gross misconduct" is poised for an objective test. Location data will either validate the story or break it beyond repair. The Court should permit that narrow discovery because it is the most efficient path to truth.

291. The Respondent's choice of language also reveals the retaliatory objective. A termination reason can be ordinary; this one was designed to be terminal. "Gross misconduct—stalking" is not merely the administrative justification for discharge. It is a label crafted to follow me after I leave the building. That choice is consistent with the logic of blacklisting: punish the employee not only with loss of the present job but with reputational toxin intended to deter future employment and to signal to others what happens to a worker who refuses to be silent.

292. State defamation principles reinforce that point. A false statement that imputes criminal conduct or moral turpitude is presumptively harmful. The injury is not hypothetical where the statement is placed in internal records and communicated to state agencies. The predictable effect is a continuing barrier to employment in the specialized field of pharmacy, where trust and character are not optional.

293. Remedies under federal law are designed to restore what retaliation destroys. The Supreme Court has explained that Title VII's remedial objective is to make the victim whole. Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975). That framework includes reinstatement or front pay where appropriate, back pay, compensatory damages, and, where the evidence ultimately shows malice or reckless indifference to federally protected rights, punitive damages. Kolstad v. American Dental, 527 U.S. 526 (1999).

294. Finally, the recordings close the loop. The recordings are not a litigation tactic manufactured after the fact; they are the contemporaneous preservation of contested events. The law permits them. Federal law, 18 U.S.C. § 2511(2)(d), recognizes one-party consent. Louisiana law, La. Rev. Stat. Ann. § 15:1303(C)(4), likewise permits a party to record. Arkansas law, Ark. Code Ann. § 5-60-120, aligns with the same rule. The point here is not merely that the recordings are lawful; it is that they are the superior record in a case where the employer's stated reasons are already contradicted by documentary and technical facts.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

295. I am a pro se litigant, but the proposition before this Court is not unusual. The Court is asked to apply settled law to a familiar pattern: an employer that viewed a Title VII participant as an inconvenient variable and attempted to erase that variable by attaching the most damaging narrative available.

296. They have not merely interrupted a job; they have derailed a life's trajectory. By current trade I am a pharmacy technician, but my long-term vocational plan has been to progress, if circumstances permit, toward becoming a pharmacist—after first achieving my personal milestone of earning AP Calculus AB credit before taking college calculus as part of any pharmacy curriculum. I have spent hundreds of hours in solitary study, mastering the complexities of the AP Calculus AB exam as the personal gateway I insist on passing before taking the required college calculus course and entering pharmacy school, preparing for a future in this industry. Even if, for whatever reason—including the possibility that I never complete the AP Calculus AB exam and therefore never follow through on my original pharmacy-school plan—I ultimately never enroll in pharmacy school or never become a pharmacist, the harm the Respondent has inflicted is still enormous: my present trade is that of a pharmacy technician, and being effectively barred from working at major pharmacy employers such as Walgreens and Walmart—despite having done nothing wrong—is itself a catastrophic professional injury.

297. The label of "gross misconduct" acts as a structural condemnation to that career path. In the small, interconnected network of pharmacy, it is a "Scarlet Letter"—a permanent marker of unemployability that unjustly closes doors and tarnishes my professional reputation before I have even fully entered the field.

298. 15.1 Entitlement to "Make Whole" Equitable Relief

299. The primary goal of Title VII remedies is to "make whole" the victim of discrimination, placing them in the position they "would have been in absent the [employer's] discriminatory conduct" (Albermarle Paper Co. v. Moody, 422 U.S. 405 (1975)).

300. Back Pay: This is a standard, non-discretionary remedy. I am entitled to a complete award of all lost wages, overtime, bonuses, and benefits from the date of my illegal termination (August 19, 2025) until the date of a final judgment.

301. Front Pay: As an alternative to my preferred remedy of reinstatement, I am entitled to front pay. This remedy compensates me for future lost earnings. Given that my termination for "gross misconduct" and a fabricated "stalking" allegation will likely blacklist me from the

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

pharmacy sector for years, a substantial front pay award is necessary to compensate for this long-term, devastating financial harm .

302. 15.2 Entitlement to Punitive Damages: The Kolstad Standard

303. In the mechanics of justice, compensation is for the victim, but punitive damages are for the aggressor. They serve as a systemic correction, a hard stop designed to force a malfunctioning corporate machine to abandon a destructive protocol.

304. Statutory Basis: The Civil Rights Act of 1991, codified at 42 U.S.C. § 1981a(a)(1), explicitly authorizes punitive damages in Title VII cases involving intentional discrimination .

305. Legal Standard: The Supreme Court, in Kolstad v. American Dental Assn., 527 U.S. 526 (1999), established the threshold for punitive damages. A plaintiff is entitled to them if they can demonstrate that the employer engaged in a discriminatory practice "with malice or with reckless indifference to [the employee's] federally protected rights" .

306. Application to the Facts: The evidence in this case overwhelmingly satisfies the Kolstad standard. The "malice" here is not an abstract feeling of ill will; it is the Respondent's specific knowledge that it was violating federal law and its decision to proceed regardless.

307. Reckless Indifference (The "Improper Access" Lie): Walmart's "Ethics" department and Investigator Jesse Hensley were put on direct notice of conclusive, exculpatory evidence on August 8, 2025. I provided them with the timestamped screenshot proving the "People You May Know" algorithm suggested the customer to me in November 2024, rendering their theory of "improper access" in January 2025 chronologically impossible. Their decision to deliberately ignore this proof and terminate me anyway is the textbook definition of reckless indifference to the truth and to my federal rights .

308. Actual Malice (The "Stalking" Fabrication): The fabrication of the "TL" stalking allegation on August 14, 2025—the exact same day Walmart's "Ethics" department received my formal Title VII Anti-Retaliation Notice—is not mere indifference. It is an act of affirmative, intentional malice. It was a tactical strike designed to punish me for my protected activity (the legal notice) and to create an unassailable pretext for termination that would bypass standard progressive discipline policies .

309. The Damages Cap: Under 42 U.S.C. § 1981a(b)(3)(D), for an employer of Walmart's size (more than 500 employees), the combined compensatory and punitive damages are capped at $300,000. My evidence of malice and reckless indifference ensures I am entitled to the maximum possible award under this statute .

310. 15.3 Entitlement to Attorney's Fees: The Christiansburg Leverage

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

311. Statutory Basis: 42 U.S.C. § 2000e-5(k) grants the court discretion to award reasonable attorney's fees (including expert fees) to the "prevailing party".

312. The Strategic Reality: As I stated in my communications with Walmart, the EEOC's processing of my charge—including its closure of the file without any determination on the merits—does not insulate Walmart from liability in this action. Under the standard set in Christiansburg Garment Co. v. EEOC, 434 U.S. 412 (1978), a prevailing plaintiff "ordinarily recovers" fees, while a defendant almost never does unless the claim is frivolous. If I retain counsel and prevail in this lawsuit, I will seek to recover my reasonable attorneys' fees and costs from Walmart to the fullest extent permitted by law.

313. Should I retain counsel, the attorney's fee, which is likely to reach into the six figures given the complexity of the electronic discovery required—will ultimately be paid by Walmart. This is the leverage that typically forces a rational actor to seek a high monetary settlement.

314. 15.4 Controlling Precedent: The Cost of Retaliation

315. My case is not an anomaly. The Respondent has a documented history of losing retaliation and pretext-based lawsuits, resulting in massive jury verdicts that are affirmed by federal courts. These cases serve as the "fossil record" of Walmart's liability in similar environments. They demonstrate that when the corporate survival machine malfunctions and devours its own, the legal system exacts a heavy price.

316. Case 1: McPadden v. Wal-Mart Stores East, L.P. (D.N.H. 2017)

317. The Facts: A female pharmacist was terminated and alleged retaliation for reporting safety concerns.

318. The Verdict: A federal jury awarded $31.2 million in total damages.

319. Relevance: This case proves that juries view the retaliation against pharmacy professionals with extreme disfavor and are willing to award eight-figure sums to punish the Respondent.

320. Case 2: EEOC (Spaeth) v. Wal-Mart Stores East LP (E.D. Wis. 2021)

321. The Facts: An ADA discrimination and retaliation case.

322. The Verdict: The jury awarded $125 million in punitive damages.

323. Relevance: Although reduced to the statutory cap, the raw number ($125 million) is a direct measurement of the jury's moral outrage at Walmart's conduct. It demonstrates that

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

when a jury sees malice, they will attempt to inflict maximum financial pain. My evidence of the August 14th "stalking" fabrication is designed to elicit this exact level of outrage .

324. Case 3: Barham v. Wal-Mart Stores, Inc. (D. Conn. 2017)

325. The Facts: A manager alleged his termination (disguised as a "job elimination") was a pretext for discrimination and retaliation.

326. The Verdict: The jury awarded $5.5 million.

327. Relevance: This is a classic "pretext" case. The jury understood that an employer's stated reason can be a lie used to cover an illegal motive. This mirrors my case exactly, where the "investigation" was a sham to hide the retaliation for my protected activities .

328. Case 4: Fifth Circuit Precedent (My Jurisdiction)

329. The Ruling: In T.A. v. Wal-Mart Stores (2022), the U.S. Court of Appeals for the Fifth Circuit—the federal court governing Louisiana—AFFIRMED a jury verdict and punitive damages award against Walmart for retaliation.

330. Relevance: This defeats any internal argument by Walmart legal counsel that a Louisiana verdict would simply be overturned on appeal. The appellate courts in this jurisdiction enforce Title VII strictly against retaliatory employers .

331. The Independence Of Protected Activity: Dispelling The "Merit" Fallacy

332. Before detailing the specific evidentiary roadmap, it is necessary to address a potential legal sophistry the Respondent may attempt to deploy. The Respondent may argue, explicitly or implicitly, that the legitimacy of my current retaliation claim against Walmart is somehow contingent upon the ultimate success of my underlying gender discrimination lawsuit against Walgreens.

333. Similarly, my filing of a lawsuit against Walgreen's was the act of pulling the alarm on perceived discrimination. Walmart retaliated against me for the act of pulling the lever. The ultimate finding of this court (as it pertains to the Walgreen's case) is irrelevant to the fact that Walmart punished me for accessing the mechanism. Title VII protects the right to petition, not merely the right to win. By conditioning my employment on "letting the Walgreens thing go," and by terminating me for continuing to pursue it, Walmart violated the sanctity of the alarm system itself .

IX. Retaliatory Timing And The Chilling Effect On Protected Activity

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

334. The chronology reinforces the retaliatory and defamatory nature of the C-MBI accusation. I worked at Walmart for roughly two years without a written reprimand. All of the "substantiated" labels—C-MBI, sexual harassment, obstruction, and the entirely fabricated Team Lead "stalking" allegation—were generated within a very short period, after corporate and "Ethics" became aware of my federal lawsuit against Walgreens and my August 2025 anti-retaliation notices.

335. The Team Lead stalking allegation, which accuses me of circling a female Team Lead's apartment building "several times," has absolutely no basis in reality. I have never loitered at any Team Lead's apartment complex; I do not even know which individual Walmart claims to be referring to. People do not misremember being confronted outside their homes by a coworker circling their building. If someone inside Walmart reported such an event, that person either invented it or repeated fiction. Walmart never asked for my whereabouts, and never raised the alleged apartment incident during the termination call on August 19, 2025. The stalking label appears only later in the paperwork, and the file itself shows that this allegation was first marked "substantiated" on August 14, 2025—the exact date I formally invoked Title VII's anti-retaliation protections, submitted to Walmart "Ethics" & Jennifer Dupree (MHWD), the same person that I reported Ashish Modi for stating that he would terminate me for simply sincerely reporting Justin Jackson to tell me to "fuck off" through a cashier.

336. A reasonable worker observing this sequence of events would be chilled from ever again filing an EEOC charge, reporting discrimination, or supporting a coworker's Title VII claim. I am that reasonable worker. Whatever the statute promises in theory, the reality is that my willingness to report civil-rights violations in the future has been severely damaged. I still believe that others deserve justice; but I also know, from painful experience, that speaking up made me the target of a coordinated effort to label me a stalker, sexual harasser, and abuser of confidential information. I need income to survive. In practice, that means I am now strongly deterred from ever again acting as a Title VII complainant or witness, no matter how serious the misconduct I might observe. It is extremely likely that I would seriously entertain not reporting a boss who used "racial slurs" to a coworker or even reporting theft from the company by some future boss, should I witness either scenario. If I cannot report completely anonymously, then I think that it is best not to report it at all. This is a pragmatic view.

X. Damages And Relief Sought

337. The defamation component of this case is particularly serious. Walmart did not merely mishandle an internal investigation; it published to a governmental body that I had committed sexual harassment, had misused confidential business information, and had admitted doing so. Those labels will follow me for the rest of my working life unless they are formally repudiated.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

338. In Williams v. MMO Behavioral Health Systems, L.L.C., a jury awarded more than $200,000 in defamation damages to an employee whose employer falsely accused her of falsifying her timecard. My situation is far more severe. Walmart is not a small clinic; it is one of the largest private employers in Louisiana and in the United States. When a corporation of that scale brands a pharmacy technician as a sexual harasser and abuser of confidential business information in LWC records, the foreseeable impact on employability is enormous.

339. For these reasons, I seek a defamation award in the neighborhood of $400,000, recognizing both the magnitude of the reputational harm and the need to deter similar conduct. These figures are not a windfall; they are a measured attempt to place a value on reputational damage that, in practice, will last a lifetime.

340. Formal Evidentiary Requests And Investigative Roadmap

341. To the Court: The Respondent has relied upon the shadows of hearsay and the fog of "anonymous" complaints to construct its case against me. I, however, rely on the hard light of digital forensics. In the modern era, we leave digital footprints that are more reliable than human memory and certainly more trustworthy than the fabricated "substantiations" of a retaliatory management team.

342. To conclusively prove the fabrications inherent in the Respondent's charge—specifically the malicious allegation of "stalking" on August 14, 2025—I formally request that this court exercise its subpoena power to obtain the following objective data.

343. Crucial Stipulation Regarding Access: I explicitly state that only this court has the right to subpoena and review my personal location data. I strictly withhold this authorization from the Respondent, Walmart Stores, Inc., at this stage. The Respondent has demonstrated itself to be a bad-faith actor, willing to twist facts and fabricate allegations to suit a retaliatory narrative. I do not trust the Respondent with this sensitive data. I invite this court to examine the evidence, but I refuse to arm the Respondent with information they may attempt to manipulate .

344. 17.1 Digital Forensics: The Alibi Data (August 14, 2025)

345. The Respondent alleges that on August 14, 2025, I was "circling" the apartment of a Team Lead. This is a lie that can be disproven by physics and data. I request the Court subpoena the following:

346. I respectfully request leave for limited compulsory process to obtain my Google Timeline / Location History for August 7–21, 2025 and my corresponding Verizon CSLI for the same window, solely to provide the Court with objective alibi data refuting the August 14, 2025 "circling the apartment" allegation.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

347. 17.2 The "Smoking Gun" Documents: Internal Communications

348. The Original Anonymous Complaint: I request the unredacted original complaint regarding the "staring" incident. The Respondent's own filings with the LWC have clarified that the "victim" did not initiate the complaint. The LWC file explicitly states: "Customer's aunt, stated she reported the harassment...". This is corroborated by Investigator Hensley's admission during my July 18, 2025 interview, where he stated: "Just so you know she [Jane Doe] wasn't the reporter on it... Someone else did". This document [Exhibit A] & the audio file (from 18/July/2025) are critical pieces of evidence because they prove the "sexual harassment" narrative is based on third-party hearsay from a non-witness relative .

349. Communications Involving Jennifer Dupree: All emails, text messages, and "OneWalmart" messages sent or received by Jennifer Dupree (Market Health and Wellness Director) referencing "Hunter Boulware," "Ashish Modi," "Justin Jackson," or "EEOC" between December 22, 2024, and August 19, 2025. I believe these documents will reveal her direct intervention to overrule the Store Manager and force the termination.

350. The "Individual" Email Drafts: Any drafts or internal discussions regarding the September 4, 2025 email sent to me by Global Ethics Appeals, specifically regarding the phrasing "Out of respect for the individual". This will reveal who the "individual" is that the company protected at the expense of the truth—likely the biased manager Dupree or the non-present aunt .

351. Intentional Infliction Of Emotional Distress (IIED): The Architecture Of Malice

352. The legal threshold for Intentional Infliction of Emotional Distress (IIED) is notoriously high, requiring conduct that is "extreme and outrageous," transcending all bounds of decency. The Respondent's attorneys will undoubtedly argue that a mere termination, no matter how unfair, does not meet this standard. However, this argument fails because it ignores the specific mechanism and timing of the Respondent's actions. We are not discussing a simple firing; we are discussing a calculated campaign of psychological warfare designed to destroy a human being's sense of security and reputation.

353. 18.1 The Fabrication of Criminality as a Weapon

354. The core of my IIED claim rests on the events of August 14, 2025. On this date, I served the Respondent with a formal legal notice regarding my civil rights. In a rational system, this would trigger a legal review. In the Respondent's system, it triggered a "nuclear" counter-strike.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

355. On the exact same day I asserted my rights, the Respondent "substantiated" a fabrication that I was "stalking" a Team Lead at her home—circling her apartment complex. This is not an accusation of poor performance; it is an accusation of a felony. It is an accusation that brands me as physically dangerous, a predator, a threat to the safety of women.

356. The Logic of Distress: To understand the distress this inflicts, consider the analogy of an architect who discovers that the foundation of his house has been secretly undermined while he sleeps. The Respondent did not just take my job; they attempted to take my liberty and my good name. By placing a false allegation of "stalking" into my permanent employment record without ever interviewing me, they created a "ticking time bomb." They ensured that if I ever applied for another job, or if a background check were run, I would be flagged as a danger.

357. The Defendants fabricated a story of me following some "team lead" because the defendants wanted to ensure a purge of a title VII witness. This calculated infliction of fear, done in direct retaliation for protected activity, meets the White v. Monsanto standard of "outrageous" conduct. It is behavior that no civilized society should tolerate

358. The "Black Box" Of Truth: Audio Evidence Vs. The Defendant'S Fabrications

359. In the analysis of aviation disasters, investigators rely on the "Black Box"—the flight data recorder that captures the objective reality of the cockpit, impervious to the self-serving narratives of the survivors. In this case, the audio recordings of my interviews with Investigator Hensley serve as the "Black Box." They provide the immutable, objective record that exposes the Respondent's perjury.

360. 19.1 The Fabrication of "Admission"

361. The most damning evidence of the Respondent's bad faith is found in the document they submitted to the Louisiana Workforce Commission (LWC). In that official filing, under the heading "Did the claimant admit to the accused actions?", the Respondent checked: "Yes, Verbal admission".

362. This is a lie. It is a verifiable, objective falsehood.

363. Allegation 1: "Sexual Harassment / Staring"

364. The Respondent's Lie to the LWC: The Respondent claimed I admitted to the action.

365. The "Black Box" Reality (The Audio): When asked if I stared at the customer's breasts, my response was unequivocal: "I'm not staring at her breasts. [...] I'm not. I'm not staring at her... This is not true" [...] "I don't think I've stared at her breasts. I think this is not true".

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

366. Analysis: To characterize an explicit denial ("This is not true") as a "Verbal admission" is not an error of interpretation; it is an act of fraud. The Respondent relied on the hope that no recording existed, allowing them to rewrite history. The audio proves that I denied the harassment.

367. Allegation 2: "Improper Access / Mishandling Information"

368. The Respondent's Lie to the LWC: The Respondent claimed I admitted to accessing the profile for improper reasons.

369. The "Black Box" Reality (The Audio): When asked if I looked her up to find her name for Facebook, I stated: "No. How can I if I'm looking up it? ... I already have her name" . I explained that any access was for legitimate business reasons (the "John Public" or "Mounjaro" protocols).

370. Analysis: I admitted to the physical act of using the computer (which is my job). I vehemently denied the improper motive (personal use). The Respondent conflated these two distinct concepts to manufacture a confession. They told the state of Louisiana I admitted to misconduct; the tape proves I defended my professionalism .

371. 19.2 The "What If" Scenario: The Necessity of the Recording

372. Consider, for a moment, the alternative timeline—a universe where I did not record these conversations. In that reality, the Respondent's LWC filing would stand as the uncontested truth. The official record would state that Hunter Boulware "admitted" to staring at women's breasts and stalking "team leads." I would be branded a pervert by my own (fabricated) confession. I would have been denied unemployment benefits.

373. The Respondent operates on the cynical assumption that the individual is helpless against the institution. They assume that their version of events, stamped with the corporate logo, will always outweigh the word of a terminated employee. They lie because they think they cannot be caught.

374. But I caught them. The audio recordings dismantle their narrative brick by brick.

375. They claim I obstructed; the audio shows I cooperated .

376. They claim I admitted guilt; the audio shows I maintained innocence.

377. They claim the investigation was fair; the audio shows the investigator ignoring the Facebook algorithm evidence I presented to him in real-time .

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

378. This is why the "Black Box" is lethal to their defense. It proves that the "gross misconduct" was not committed by me, but by the Respondent's HR and Legal departments in their drafting of the termination documents.

379. 19.3 The "Telephone Game" Revisited: Error on Top of Error

380. The existence of the audio recordings allows us to definitively map the degradation of truth within the Respondent's system. It exposes a phenomenon analogous to the "Telephone Game," where a message is corrupted as it passes from one node to another.

381. Original Signal: I engage in a benign interaction with a customer.

382. First Distortion (The Aunt): A non-witness (the aunt) misinterprets my physiological freeze response as "staring" and reports it to the Store Manager. This is "Hearsay Level 1."

383. Second Distortion (Jennifer Dupree): The Store Manager investigates and finds no harassment. However, Jennifer Dupree overrules him, forcing a report to Ethics based on the aunt's hearsay. This is "Hearsay Level 2" (Double Hearsay).

384. Third Distortion (Jesse Hensley): Investigator Hensley interviews me. I deny the allegations. He ignores my denials and the exculpatory Facebook evidence.

385. Final Distortion (The LWC Filing): The Respondent files a document with the state claiming I "admitted" to the conduct.

386. This is not an investigation; it is a cascade of errors. It is error on top of error, hearsay piled upon hearsay. The final allegation—that I admitted guilt—is a complete mutation of the original reality. Without the audio recording, this mutation would have become the official history. The recording proves that the Respondent's case is not just flawed; it is a fiction.

387. Wage-and-Hour Violations: Off-the-Clock Coercion

388. The Respondent's disregard for federal law extends beyond Title VII and into the realm of the Fair Labor Standards Act (FLSA). While the primary thrust of this Charge is the retaliatory termination, the mechanism used to strip me of my rights—the Mandatory Arbitration Agreement (MAA)—constitutes an independent, actionable violation of wage and hour laws.

389. 21.1 The Illegal Presentation of the MAA

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

390. On January 24, 2025, I was ambushed at the time clock. Management presented me with a complex legal document (the MAA) and issued a directive: I must "agree" to it before I would be permitted to clock in and begin my shift.

391. The Legal Violation: Under the FLSA, "work" is broadly defined as any exertion of physical or mental effort controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer.

392. The Task: Reading, comprehending, and signing a legal contract that waives constitutional and statutory rights is a task of significant cognitive load. It is "work."

393. The Constraint: By requiring this task to be completed before clocking in, the Respondent forced me to perform work "off the clock."

394. The Coercion: The "agreement" was not a voluntary administrative update; it was a condition of immediate employment. "Sign this unpaid, off-the-clock, or you do not work."

395. This creates a compounded illegality: (1) The contract itself is void due to duress; and (2) the time spent reviewing it (however brief, due to the pressure) was uncompensated compensable time. It demonstrates a pattern of treating federal labor standards not as laws, but as suggestions to be discarded when they interfere with the efficient purging of a liability.


396. The Broader Implications: The "Chilling Effect" On The Labor Market

397. To understand why this lawsuit is necessary, one must look beyond the individual harm to Hunter Boulware and consider the structural integrity of the entire Title VII protection system. The law does not exist solely to remedy individual wrongs; it exists to maintain a functional marketplace where rights can be asserted without fear of annihilation.

398. 22.1 The Destruction of Title VII's Reporting Protections

399. Earlier in this Complaint, I established the analogy of the "Essential Witness" on the construction site. Let us expand that to the architecture of a city.

400. Title VII functions as the fire alarm system for the American workplace. It relies entirely on the willingness of individuals—"Witnesses"—to pull the lever when they see the smoke of discrimination or harassment. The system presupposes that the person pulling the alarm will be protected, even if the fire is small, or even if it turns out to be smoke from a toaster rather than an inferno.


Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

401. The Signal: When Ashish Modi told me, "If you report this again, you will be terminated," he sent a signal not just to me, but to every employee in the store: The alarm system is rigged. If you pull the lever, you will be electrocuted.

402. The Consequence: If this retaliation is allowed to stand, the "chilling effect" is absolute. No rational employee will ever report harassment again. The cost of reporting (termination, defamation, career ruin) becomes infinitely higher than the cost of silence.

403. 22.2 The "Blacklisting" of Civil Rights Litigants

404. The Respondent's behavior confirms the necessity of the Supreme Court's ruling in Robinson v. Shell Oil Co.. By conditioning my employment on "letting the Walgreens thing go," and by terminating me for continuing to pursue it, Walmart attempted to enforce a "Blacklist."

405. The Market Distortion: If large employers like Walmart are permitted to purge employees simply because they have active litigation against former employers, then the class of "protected persons" under Title VII ceases to exist in practice. A "right" that renders you unemployable is not a right; it is a disability.

406. The Logic of the Purge: Walmart viewed my Title VII activity as a virus. They sought to "quarantine" the store by removing the carrier.

407. The Necessity of Correction: Although the EEOC processed my charge, it ultimately made no determination on the merits. It is now this Court that must re-establish the market norm: that engaging in protected activity is a legal right, not a professional defect. The Court must penalize the Respondent to ensure that the "cost" of retaliation is higher than the "cost" of compliance.

408. For these reasons within this paper, I respectfully request that the Court preserve the full scope of my causes of action, deny any attempt to dismiss or minimize my claims at the pleading stage, and permit the narrowly tailored discovery necessary to confirm the objective truth of the Respondent's fabricated narrative.

409. For these reasons, I respectfully request that the Court allow this case to proceed, preserve the full scope of my claims, and permit narrowly tailored discovery to confirm the objective falsity of the Respondent's stated reasons and the retaliatory motive driving my termination.

410. The retaliatory campaign did not stop at threats. The audio recording from January 14, 2025 reflects that I was shunned and isolated at work, and that this ostracism was not organic but was directed by management. This kind of institutional shunning is a materially

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)                                    Page 61 of 67

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

adverse action under Title VII because it is designed to chill protected activity and to signal to other employees that reporting misconduct will be punished.

411. The record described in this Complaint provides both circumstantial and direct evidence of retaliation. The most stark example occurred on December 22, 2024, when Justin Jackson used cashier Angel James to deliver the message to "fuck off," and I reported that third-party harassment through proper channels. Instead of protecting an employee who was being targeted, Ashish Modi threatened me, in substance, that if I ever reported Justin Jackson again I would be terminated for "gross misconduct." That threat, explicitly linked to my protected activity, is as close to a managerial admission of unlawful retaliation as one can expect to find at the pleading stage.

412. Conclusion And Request For Targeted Relief

413. The record I present is not a chain of inferences built on speculation; it is a chronology of retaliation anchored to explicit threats, shifting rationales, and the deliberate escalation of stigmatizing labels. The December 22, 2024 sequence is the fulcrum of this case: after Justin Jackson relayed the message to Angel James to tell me to "fuck off," Ashish Modi warned me that if I reported Justin again, I would be terminated for "gross misconduct."

414. That threat is precisely the type of employer conduct that Title VII's anti-retaliation provisions exist to deter: it weaponizes the prospect of termination to silence opposition and to chill the reasonable employee from reporting unlawful or abusive conduct. The January 14, 2025 audio further corroborates this retaliatory environment by reflecting management-directed shunning, a coordinated response designed to isolate me and to make continued protected activity professionally unsafe.

415. When the Respondent later memorialized its pretext in terms severe enough to end not only my job but my future employability, the pattern became complete. The "C-MBI—substantiated" and "gross misconduct—stalking" labels were not neutral findings; they were punitive narrative devices deployed after protected activity to justify a foreordained outcome. Taken together with the contemporaneous audio, the shifting rationales, and the retaliatory timing, the only coherent inference is that Defendants acted with retaliatory motive and reckless disregard for the truth.

Prayer for Relief

416. WHEREFORE, I, Hunter Boulware, respectfully request that, after trial on the merits , the Court enter judgment in my favor and against all Defendants, jointly and severally, and grant the following relief:

417. Declaratory Relief
Declaring that Defendants' acts and omissions described in this Complaint violated Title

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

VII's anti-retaliation provisions, 42 U.S.C. § 2000e-3(a), Louisiana law governing defamation per se and intentional infliction of emotional distress, and any other causes of action stated in this Complaint.

418. Reinstatement and Restoration of Status
Ordering Walmart to reinstate me to my former pharmacy-technician position (or a substantially equivalent position in the Shreveport/Bossier area) with the same or better pay, hours, responsibilities, and advancement opportunities I would have enjoyed absent the unlawful conduct, and restoring my seniority, tenure, and benefits as if I had never been suspended or terminated.

419. Front Pay in the Alternative
If the Court finds reinstatement impracticable, awarding me front pay in lieu of reinstatement for a reasonable period sufficient to make me whole for the loss of future earnings and benefits.

420. Back Pay and Lost Benefits
Awarding me back pay from the date of my suspension and termination through the date of judgment, including lost wages, overtime, and the value of lost or diminished benefits and other make-whole economic damages, together with prejudgment interest as allowed by law.

421. Personnel-File and Internal-Record Correction
Ordering Walmart to expunge and permanently remove from all internal systems and personnel files every notation, label, or code reflecting "Harassment Sexual – Substantiated – Termination," "C-MBI – Substantiated – Termination," "stalking," "gross misconduct," "not eligible for rehire," or any similar characterization tied to the events described in this Complaint, and to replace any such entries with neutral language that does not suggest wrongdoing by me.

422. Retraction and Correction to the LWC and Other Third Parties
Ordering Walmart to retract and correct its written submissions to the Louisiana Workforce Commission and to any other governmental agency, background-check vendor, reference-check service, or prospective employer to whom it communicated the false "substantiated" harassment, stalking, or C-MBI narrative, including by:
(a) notifying those third parties in writing that Walmart's prior statements implying that I committed sexual harassment, stalking, or criminal-type conduct were false;
(b) withdrawing any suggestion that I "admitted" to the accused conduct; and
(c) providing corrected language that accurately reflects that no interview or confession ever occurred and that Walmart does not contend that I committed the criminal-type acts previously implied.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

423. Injunctive and Structural Relief Regarding Ethics/HR Systems

Ordering Walmart to implement appropriate injunctive and structural reforms to prevent similar retaliation and cat's-paw misuse of its Ethics and HR systems in the future, including but not limited to:

(a) revising Ethics-investigation procedures to require verification of allegations, collection and preservation of exculpatory evidence, and direct input from alleged victims; and

(b) adopting safeguards against the elevation of hearsay-only complaints by managers with obvious retaliatory motives, and against the use of Ethics or HR processes as a vehicle to retaliate against Title VII witnesses or participants.

424. Compensatory Damages

Awarding me compensatory damages for emotional distress, humiliation, anxiety, reputational harm, and other non-economic losses caused by Defendants' retaliation, defamation per se, intentional infliction of emotional distress, and related unlawful conduct.

425. Punitive / Exemplary Damages

Awarding punitive and/or exemplary damages against Walmart, in an amount sufficient to punish and deter similar misconduct, to the extent authorized by Title VII, Louisiana law, and any other applicable authority, in light of Walmart's reckless and/or knowing disregard for my civil-rights protections and its willingness to weaponize a fabricated criminal-type narrative against me.

426. Attorneys' Fees and Costs

Awarding my taxable costs of court and, if I am represented by counsel at any stage, reasonable attorneys' fees as permitted by 42 U.S.C. § 2000e-5(k) and any other applicable fee-shifting provisions, including fees for any counsel I may later retain.

427. Pre- and Post-Judgment Interest

Awarding pre- and post-judgment interest on all monetary awards as allowed by law.

428. Other and Further Relief

Granting such other and further legal and equitable relief, at law or in equity, as the Court deems just and proper under the facts and governing law in this

429. FLSA Unpaid Wages and Liquidated Damages

Awarding me unpaid minimum wages and/or overtime for all compensable off-the-clock time, including the time Defendants required me to review and sign the Mandatory Arbitration Agreement before clocking in, together with an equal amount as liquidated damages under 29 U.S.C. § 216(b), and awarding the reasonable attorney fees and costs mandated by law.

430. Louisiana Wage Payment Act: Unpaid Wages, Penalty Wages, Attorney Fees, and Interest

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

Awarding me all unpaid wages then due upon separation as required by La. R.S. 23:631, together with penalty wages and reasonable attorney fees under La. R.S. 23:632, and recognizing that any forfeiture of earned wages upon discharge is unlawful under La. R.S. 23:634, with judicial interest as applicable.

431. Declaratory and Injunctive Relief Regarding the Mandatory Arbitration Agreement
Declaring the Mandatory Arbitration Agreement null and void for duress and lack of free consent under Louisiana Civil Code art. 1959, and enjoining Defendants from asserting or enforcing that agreement against me with respect to the claims pleaded herein.

432. Defamation-Specific General and Special Damages
Awarding me general damages and special damages for defamation per se in an amount to be proven at trial, including past and future loss of income and reputational harm, consistent with comparable awards under controlling law.

433. Conditional Defendant Relief for Unidentified Accuser (If Identified)
If discovery identifies any individual whose false allegations were relied upon or republished by Defendants in connection with the stalking or harassment narrative, granting leave to amend to add that person as a defendant and awarding the separate modest judgment requested in this Complaint.

434. Verification and Declaration

435. I, Hunter Boulware, hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. The facts contained herein are supported by objective evidence, including audio recordings, digital timestamps, GPS data, and the Respondent's own internal documentation.

436. I further certify that:

437. I have exhausted all available administrative remedies within the Respondent's internal hierarchy.

438. I have acted in good faith throughout this process, seeking only to perform my job duties and protect my civil rights.

439. I stand ready to provide the original digital files for all exhibits listed below upon the issuance of a subpoena by this Court or a formal request from the Court or any duly authorized officer of the Court.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

440. Executed on this 9th day of December 2025.

*Hunter Boulware*

441. Hunter Boulware, Charging Party

442. EXHIBIT INDEX:
("Proof of the Defamation and Retaliation for Title VII-Protected Activity" Evidence File)

Exhibit A – LWC Ethics Case Summary Page
Screenshot of the last page of Walmart's Ethics/LWC submission showing the stated reasons for termination, "Harassment Sexual – Substantiated – Termination," "C-MBI – Substantiated – Termination," "ID-Obstruction – Termination," and "Yes, verbal admission."

Exhibit B – 14 Jan 2025 Audio (Cashier Angel James)
Audio of conversation with cashier Angel James describing what management said after I reported Justin Jackson and that I had "almost gotten fired" for reporting him.

Exhibit C – 13 Jul 2024 Audio (Justin Jackson Incident)
Audio of Justin Jackson inside the store, armed, telling me to "fuck off" and indicating his intention to get me fired.

Exhibit D – CSLI / GPS Request to Verizon
Letter requesting my cell-site / GPS location data for dates relevant to the alleged Team Lead "stalking" incident.

Exhibit E – 18 Jul 2025 Audio (Hensley Interview re "Jane Doe")
Audio of investigator Jesse Hensley's first interview about "Jane Doe," outlining the allegations and my denials/explanations.

Exhibit F – 8 Aug 2025 Audio (Hensley Follow-Up; Access Dates)
Audio of follow-up call with Hensley discussing two Connexus access dates to "Jane Doe's" profile and my explanation, tied to the Facebook "People You May Know" screenshot.

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)

202512.090903 Lawsuit Walmart Against [This is for my record keeping only.]

**Exhibit G – Emails / Anti-Retaliation Notices to Ethics, Hensley, Dupree**
Emails and related messages to Walmart Ethics/HR, Hensley, and Jennifer Dupree, including my written anti-retaliation notices and evidence-preservation demands.

**Exhibit H – 19 Aug 2025 Termination Call Audio**
Audio recording of the phone call in which Walmart formally terminated me and stated ONLY two reasons for termination.

**Exhibit I – HR Letters with Shifting Termination Reasons**
Two HR / Ethics letters giving rationales for termination that differ from the reasons given in the 19 Aug 2025 termination call.

**Exhibit J – "Substantiated Sexual Harassment" Documentation**
Document(s) adding or emphasizing a "substantiated sexual harassment" finding, illustrating shifting allegations and pretext.

**Exhibit K – LWC Unemployment Decision / Lack of Evidence**
LWC adjudication materials showing Walmart could not supply supporting evidence and that I was awarded unemployment benefits.

**Exhibit L – Screenshots of Texts / Emails re Modi and Dupree**
Screenshots of my emails and texts to Jennifer Dupree and others documenting Modi's threat to fire me for reporting Justin and related retaliation.

**Exhibit M – Arbitration / Pattern of Targeting Documentation**
Documentation (including arbitration-agreement screen/notice and my written objection) showing I alone was forced toward arbitration after reporting management, supporting a broader pattern of unfair targeting.

Exhibit N – screenshot of MAA (taken on 24/Jan/25)

Hunter Boulware
8501 Millicent Way, Apt 1116, Building 18
Shreveport, LA 71115
hunterboulware45@gmail.com
318-200-0784 (318-200-7037)